**Michael CRISP, Petitioner-Appellant,**

v.

**Jack R. DUCKWORTH, Warden, Respondent-Appellee.**

**No. 83–1368.**

United States Court of Appeals, Seventh Circuit.

Argued April 3, 1984.

Decided Sept. 14, 1984.

Rehearing Denied Oct. 23, 1984.

J. Richard Kiefer, Indianapolis, Ind., for petitioner-appellant.

Kermit R. Hilles, Deputy Atty. Gen., Indianapolis, Ind., for respondent-appellee.

582

Before WOOD, and FLAUM, Circuit Judges, and GIBSON, Senior Circuit Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

Michael Crisp appeals the district court's denial of his petition for a writ of habeas corpus. Crisp argues that he was denied effective assistance of counsel at his state court first degree murder trial due to the allegedly incompetent acts and omissions of his attorney, Jack Quirk. Although this is a close and difficult case, under the strict standards set forth in *Strickland v. Washington,* —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), we affirm.[1]

I

The story behind this petition started when defendant-appellant Michael Crisp met Patti Elder. That was about two years before the incident that led to his conviction for first degree murder. Crisp and Elder dated and then lived together, but eventually their relationship deteriorated and Crisp moved out. Elder refused Crisp's requests to move back in, but Crisp did occasionally come and spend the night. On one of these occasions Crisp held a knife to Elder's throat and told her, "It's either going to be you or me tonight." Crisp then gave her five minutes to get a gun and shoot him. When Elder told Crisp that she did not have a gun, he offered her his knife, but nothing further came of the incident.

On a Sunday morning three days later, after an unsuccessful attempt to commit suicide, Crisp drove to Elder's house, but parked four blocks away, allegedly because his car overheated. Crisp entered the house through the back door, and when he discovered that no one was home, he went to sleep in one of the bedrooms. Elder

returned and saw that the back door had been opened. She feared Crisp was there, and so she drove to a friend's house for help. Elder got John Joslin, Barbara Joslin, and Timothy Brackman to return with her to her house. Brackman entered through the back door, while John Joslin, who had a double-barrelled shotgun, entered through the front. At some point Crisp and Joslin met and exchanged gunfire. Crisp was unharmed, but Joslin died at the scene. Brackman then jumped on Crisp and, as the two struggled, Crisp stabbed Brackman with a knife. Crisp also stabbed Barbara Joslin in the leg as she fled from the scene.

Crisp went immediately to a Catholic priest, Father Wieber, who had been counseling him about his difficulties with Elder. Thirty minutes after the shooting Crisp went with the priest to the sheriff and surrendered. A jury eventually convicted him of first degree murder, and the Indiana courts upheld the conviction. Crisp now claims that this conviction resulted from incompetent trial counsel.

II

■ *Strickland v. Washington,* —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), established a two-prong test for determining whether a conviction must be set aside due to ineffective assistance of counsel. The defendant must show that his attorney's representation "fell below an objective standard of reasonableness," *id.* 104 S.Ct. at 2065, and that there exists a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 2068.

■ The multiplicity of allegedly incompetent acts and omissions Crisp claims his attorney, Jack Quirk, committed fall into

---

* The Honorable Floyd R. Gibson, Senior Circuit Judge of the Eighth Circuit, is sitting by designation.

1. Crisp's appellate counsel, J. Richard Kiefer, has served pro bono since we initially denied his request for appointment. However, in light of Kiefer's excellent brief and oral argument, and our determination after reading the briefs that this appeal was not frivolous, we ruled from the bench after oral argument to declare Mr. Kiefer court-appointed counsel, effective retroactively.

three categories: inadequate investigation and trial preparation; errors committed during the course of the trial; and conflicts of interest. Though we examine each example of incompetence individually, we must also consider their cumulative effect in light of the totality of circumstances. *Strickland,* 104 S.Ct. at 2069; *United States v. Brown,* 739 F.2d 1136 at 1145 (7th Cir.1984). On one hand, this means that an attorney's individual errors may not, looking at the trial as a whole, cast doubt on the reliability of the result, and therefore would not merit reversal. On the other hand, even if individual acts or omissions are not so grievous as to merit a finding of incompetence or of prejudice from incompetence, their cumulative effect may be substantial enough to meet the *Strickland* test. *See United States v. Merritt,* 528 F.2d 650, 651 (7th Cir.1976) (per curiam); *United States v. Hammonds,* 425 F.2d 597, 604 (D.C.Cir.1970). Looking at the alleged errors as a whole, we agree that Crisp has overcome the presumption that his trial counsel provided reasonable professional assistance, *Strickland,* 104 S.Ct. at 2065; *United States v. Weston,* 708 F.2d 302, 306 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 397, 78 L.Ed.2d 340 (1984), and has established that counsel was in fact incompetent. But, looking at the trial as a whole, we do not believe that his "counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result." *Strickland,* 104 S.Ct. at 2064.

### III

**A.** *Claims of Inadequate Investigation and Trial Preparation.*

Crisp alleges that Quirk did not adequately prepare his case because he failed to interview the three witnesses to the killing, his interviews with defense witnesses

were limited to a few minutes the day each witness took the stand, he failed to interview or call the neighbor Patti Elder went to immediately upon her discovery that Crisp was in her house, he failed to interview or call any of the persons Crisp said could corroborate his story that his car frequently overheats, he failed to interview Father Wieber, he failed to visit the scene of the crime, and he failed to adequately prepare Crisp to testify.

■ Effective representation hinges on adequate investigation and pre-trial preparation. *See United States ex rel. Spencer v. Warden, Pontiac Correctional Center,* 545 F.2d 21, 24–25 (7th Cir.1976) (as corrected) (mere appearance of in-court effectiveness cannot compensate for inadequate pre-trial preparation). Quirk testified at a post-trial hearing on the competency of his representation that he generally knows without investigating what information he wants to put before the jury. We find this an amazing statement. Investigation may help an attorney develop or even discover a defense, locate witnesses, or unveil impeachment evidence. Though there may be unusual cases when an attorney can make a rational decision that investigation is unnecessary, as a general rule an attorney must investigate a case in order to provide minimally competent professional representation. *See United States v. Tucker,* 716 F.2d 576, 581–83 & nn. 16 & 18 (9th Cir.1983) (as corrected); *Davis v. Alabama,* 596 F.2d 1214, 1217 (5th Cir. 1979), *vacated as moot,* 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 256 (1980); *Morrow v. Parratt,* 574 F.2d 411, 413 (8th Cir.1978); *United States v. DeCoster,* 487 F.2d 1197, 1204 (D.C.Cir.1973); *United States ex rel. Cosey v. Wolff,* 562 F.Supp. 140, 144 (N.D. Ill.1983), *aff'd,* 727 F.2d 656, 658 (7th Cir. 1984).[2]

Considering the above list of avenues Quirk neglected to pursue, it would be dif-

---

**2.** Quirk testified that he relied on Crisp's family to gather and give him information. While such information may be helpful, to be adequately prepared, an attorney must conduct his own investigation. *See, e.g., Morrow v. Parratt,*

574 F.2d at 413 ("a reasonably competent attorney will conduct an in-depth investigation of the case which includes an independent interviewing of the witnesses").

ficult to conclude that he thoroughly investigated and prepared this case. Under the circumstances, however, this lack of zealous pre-trial preparation does not appear to have prejudiced the outcome of the proceeding.

■ Crisp first complains about Quirk's failure to interview Joslin, Elder, and Brackman, key prosecution witnesses and the only persons present during the shooting. Quirk explained that he had Joslin's, Elder's, and Brackman's police statements and a transcript of Brackman's testimony at a preliminary hearing, and therefore did not need to interview them. We do not agree that police statements can generally serve as an adequate substitute for a personal interview. *See United States v. Tucker*, 716 F.2d at 583 & n. 17; *United States v. DeCoster*, 487 F.2d at 1204 ("a defense attorney ... should interview not only his own witnesses but also those that the government intends to call"). Quirk also explained that he did not interview the prosecution witnesses so that they would be nervous during cross-examination. This "is an absurd and dangerous policy which can only be viewed as an abdication—not an exercise—of ... professional judgment." *McQueen v. Swenson*, 498 F.2d 207, 216 (8th Cir.1974). Though we conclude that it would have been prudent for Quirk to interview Joslin, Elder, and Brackman, Crisp has not demonstrated that conducting personal interviews would have yielded different testimony or cross-examination in this particular case, and therefore has not shown any prejudice.

■ Similarly, it would have been prudent for Quirk to interview the defense witnesses prior to the day they testified. Quirk said that he relied on Crisp's representation as to what their testimony would be and therefore did not need to interview them. As a general practice, it would have been wiser to interview the witnesses, *see United States v. Tucker*, 716 F.2d at 583 n. 17, 584 & n. 21; *McQueen v. Swenson*, 498 F.2d at 216 (an attorney should do more investigation than merely interviewing the defendant), but Crisp has again made no

showing that the witnesses' testimony would have been any different in this case if they had been interviewed earlier and more thoroughly prepared.

■ The other claims of inadequate investigation and preparation are a bit more problematic since Crisp explains why they might be prejudicial, but even considering their potential cumulative effect, we do not believe they sufficiently undermine confidence in the outcome of the trial to warrant habeas relief. First, Crisp claims that Quirk's failure to interview or call Elder's neighbor was prejudicial because the neighbor would have testified that Elder visited her before going to get the Joslins, and that Elder was angry. Crisp asserts that this testimony would have supported a self defense claim by suggesting that Elder and the Joslins intended to harm Crisp. Quirk counters that his failure to contact the neighbor was the result of a strategic decision: he thought (without having interviewed her) that her testimony would be damaging. Though there may be instances when the decision not to contact a potential defense witness is justified, *see United States ex rel. Cosey v. Wolff*, 562 F.Supp. at 145–46, an attorney who fails even to interview a readily available witness whose noncumulative testimony may potentially aid the defense should not be allowed automatically to defend his omission simply by raising the shield of "trial strategy and tactics," *see id.* at 144–46; *see also Davis v. Alabama*, 596 F.2d at 1217 ("An attorney does not provide effective assistance if he fails to investigate sources of evidence which may be helpful to the defense."); *United States v. DeCoster*, 487 F.2d at 1201 (A court should not "second guess strategic and tactical choices made by trial counsel. However, when counsel's choices are uninformed ..., a defendant is denied the effective assistance of counsel.") (footnotes omitted). However, having reviewed the testimony Elder's neighbor gave at the post-trial competency hearing, something Quirk could not do before he decided not even to interview

her, we do not believe that the testimony would have aided the defense.

■ Similarly, Crisp's attorney failed to seek out or call any of the witnesses whose testimony Crisp said would have supported his claim that he parked four blocks from Elder's house not as a means of concealing his presence, but because his car overheated. The district court noted that though this may have been a mistake in strategy, it was not "in and of itself sufficient" to label Crisp's representation as incompetent. This statement highlights our concern with the district court's overall approach: though each individual error or "mistake in strategy" may not be egregious enough to label an attorney incompetent, the sum of all together may be.

■ The district court went on to point out that Dorene Crabtree testified that Crisp's car had a propensity to overheat, and that any additional testimony on this point would have been cumulative. Dorene Crabtree, however, is Crisp's mother. Having independent witnesses corroborate a defendant's story may be essential—especially in a first degree murder case; testimony of additional witnesses cannot automatically be categorized as cumulative and unnecessary. In this case, however, the testimony was on a fairly minor point, and the potential witnesses were not independent (one was Crisp's cousin, the other two were friends of Crisp). Moreover, the post-trial competency hearing reveals that their testimony would not have been particularly beneficial. Crisp's cousin testified at the post-trial competency hearing only that Crisp asked for water for his leaking radiator after his car had been parked at her house for two weeks. Crisp's two friends testified that when they drove to Florida with Crisp, Crisp's car overheated three times. The three of them drove from Indi-

ana, however, and the car did not overheat until they were in Georgia, after they had driven approximately 550–600 miles without any lengthy stops.

Quirk also failed to interview Father Wieber, the priest Crisp contacted immediately after the shooting. The district court dismissed this claim outright, saying that Quirk did talk to Father Wieber by telephone about his observations of Crisp. We do not find the facts surrounding this conversation quite as clear as did the district court. Crisp admits that Quirk telephoned Father Wieber, but points out that this took place before Father Wieber had permission from the bishop to testify,[3] and that Father Wieber therefore did not discuss any of the facts of the case. Quirk made no follow-up call. He claimed at the post-trial hearing that none was necessary because although Father Wieber did not discuss confidential matters, he did talk about the facts of the case and his observations of Crisp. Father Wieber, however, submitted an affidavit stating that if he had been able to appear at the post-trial hearing he would have testified that he had not discussed any of the facts of the case with Quirk due to his lack of permission from the bishop at that time to do so. It is interesting to note that Quirk was unable at the post-trial hearing to back up his claim by pointing out some of the observations Father Wieber supposedly made; Quirk did not remember any of Father Wieber's observations, and he had not taken any notes during or shortly after the telephone conversation.[4]

Although the district court is responsible for weighing the credibility of witnesses and resolving conflicts in their testimony, there is no indication that such weighing ever took place in this case. The district court never mentioned Father Wieber's af-

---

3. This permission from the bishop was simply permission to testify, it was not permission to disclose confidences.

4. This failure to take notes during witness interviews and during trial apparently is one of Quirk's standard operating procedures. While we understand that it is normal after a trial to

forget details that were at one's fingertips before and during trial, and that taking copious notes during trial may be more distracting than beneficial, it is difficult to understand how an attorney can, without the aid of any trial or pre-trial notes, keep all potentially important details in mind in a trial with 29 witnesses.

fidavit. We therefore cannot accept the district court's view of the facts in this instance. Even so, the resulting prejudice, if there is any at all, is minimal at best.

■ Father Wieber testified for the prosecution that Crisp appeared "a little nervous" after the shooting. Crisp claims prejudice from Quirk's failure to cross-examine Father Wieber on that statement. Father Wieber's post-trial affidavit, submitted after Crisp obtained new counsel, states that Crisp was more than simply "a little nervous" and was in fact in a state of shock. Crisp claims that the prosecutor used Father Wieber's trial description of Crisp's demeanor after the shooting to portray Crisp as a cold-blooded murderer. We have reviewed the trial transcript, however, and find no instance where the prosecutor did this. Father Wieber's single sentence that Crisp was a little nervous does not by itself conjure up an image of a ruthless killer.

■ Crisp next complains about Quirk's failure to visit Elder's house, the scene of the crime. Crisp claims prejudice from this in that Quirk consequently failed to object to the government's incorrect diagram of the house, thereby putting Crisp in the position of having to dispute the accuracy of the diagram himself when he testified as to his version of the sequence of events. Crisp argues that this cast doubt on his credibility since, by Quirk's failure to object to the diagram, Crisp was the only person saying the government was wrong about an easily resolvable factual dispute. *Cf. United States ex rel. Cosey v. Wolff,* 562 F.Supp. at 145 n. 6 ("swearing contests between a defendant and his accuser are nearly always unpredictable as to outcome") (quoting *United States ex rel. Williams v. Twomey,* 510 F.2d 634, 640 (7th Cir.), *cert. denied,* 423 U.S. 876, 96 S.Ct. 148, 46 L.Ed.2d 109 (1975)). The government did not, however, dispute Crisp in this case, but conceded the possibility of error. Therefore, if anything, the mistake in the government's diagram cast doubt on the government's care in preparing its case, not on Crisp's credibility.[5]

■ Crisp's final example of Quirk's inadequate investigation and pre-trial preparation is Crisp's allegation that Quirk failed to consult adequately with Crisp and prepare him for his trial testimony. Crisp claims that he did not know he would be called as a witness until 30 minutes before trial, and that Quirk was not adequately prepared to examine Crisp because he never took notes of their conversations and he had no check-list for Crisp's testimony. *See supra* note 4. Even if we accept Crisp's version of the facts (the state asserts that Crisp knew ten days to two weeks before trial that he would take the stand), Crisp's only example of prejudice is completely without merit. Crisp alleges that as a result of Quirk's lack of preparation, Quirk failed to ask Crisp at trial what Crisp observed out of Elder's window as Joslin and Brackman approached the house. Crisp claims that, if asked, he would have testified that he had seen Joslin loading his shotgun, thus supporting Crisp's claim of self defense. The transcript reveals, however, that Quirk did in fact ask Crisp what he saw Joslin do when Joslin got out of his car, but Crisp failed to mention the loading of the shotgun.[6]

---

5. Quirk justified his omission by claiming that from photographs he saw of Elder's house he knew the diagram was incorrect, but did not object because he wanted the diagram submitted into evidence so that he could use it, and he preferred it to be inaccurate so as to raise doubts about the location and testimony of the witnesses. We find this "explanation" somewhat fantastic. If the inaccuracies were likely to raise doubts about anything, they were likely to raise doubts about the credibility of Crisp— the defendant and the only person contesting the accuracy of the diagram. If Quirk wanted to use a diagram, he should have prepared his own.

6. Quirk asked Crisp three times what he saw Joslin do as he approached the house:

A: I noticed John coming towards the front door and Barbara and Patty [sic] were following him.
Q: Before you get to that point you saw them get out of the car?
A: Yes.

\* \* \* \* \* \*

## B. *Trial Errors.*

 Crisp alleges that Quirk committed a number of errors at the beginning of trial in that he failed to use a single peremptory challenge at jury selection, he failed to request that a court reporter record voir dire and the prosecutor's opening statement, and he failed to make an opening statement himself. Crisp has not, however, shown that he suffered any degree of prejudice from these omissions. While it may be somewhat unusual for a defense attorney to fail to challenge a single juror in a first degree murder trial, Quirk stated that he did challenge jurors for cause; all Crisp claims on appeal is that Quirk made no *peremptory* challenges. Crisp also fails to allege any prejudice from Quirk's failure to request that voir dire and the prosecutor's opening statement be recorded.[7] As for Quirk's failure to make an opening statement, the district court noted that this falls within the realm of tactical trial decisions. While there are cases where there is good reason not to give an opening statement, it is difficult to label the decision not to give one in this case a tactical decision since Quirk testified that he has a policy of *never* giving an opening statement. Tactical and strategic decisions are decisions based on the specific facts of a given case; general policies against interviewing the state's witnesses or against making opening statements are not policies based on strategy: they are policies grounded in negligence. *See McQueen v. Swenson,* 498 F.2d at 216. Even so, Crisp has not alleged that he was harmed by Quirk's failure to give an opening, and,

upon reviewing the trial transcript, we agree with the district court's determination that, in this particular case, there was no prejudice.

As another example of incompetence at trial, Crisp claims that Quirk, due to lack of adequate preparation, elicited testimony from Timothy Brackman, one of the eyewitnesses, which was damaging to Crisp. Although Crisp's contention here has some merit, the snippet of testimony was not sufficiently damaging, even considering the potential combined effect of all of Quirk's other errors or omissions, to shake our confidence in the reliability of the jury's verdict.[8]

 Crisp also complains about several errors Quirk made with respect to jury instructions and the way he improperly handled certain procedural matters. We agree that Quirk made several errors, that these errors indicate that Quirk was not as familiar with Indiana law as an attorney should be whose practice is 80–90 percent Indiana criminal defense work, and that the errors therefore provide further evidence that Quirk did not provide Crisp with professionally competent representation. We do not believe, however, that Crisp was prejudiced, and find that the district court adequately disposed of these claims. *See also Crisp v. State,* 271 Ind. 534, 394 N.E.2d 115, 120–21 (1979) (discussion of jury instructions).

## C. *Conflicts of Interest.*

Finally, Crisp alleges that three conflicts of interest affected the zealousness of

---

Q: Okay. *Now, exactly after they got out of the car what did you see John Joslin do, if anything?*
A: Well, I just more or less glanced at Tim. Tim was kinda trotting around the house, and I just glanced at him.
Q: *Did you see John Joslin do anything?*
A: Walked towards the house.
Q: *Okay. What did he do then?*
A: At that point I don't know.
Transcript at 2215 (emphasis added).

**7.** The Indiana Supreme Court pointed out that it is not uncommon in Delaware Circuit Court, where Crisp's trial was held, to fail to record voir dire and opening argument. *Crisp v. State,*

271 Ind. 534, 394 N.E.2d 115, 119 (1979). While we find no prejudice from that practice in this case since Crisp did not even allege that any errors were committed, resolution of the issue would be much more difficult if a defendant does allege that there were reversible errors, and we had no transcript to review.

**8.** Brackman testified on direct examination that Crisp stabbed him and he temporarily lost consciousness or "got a little dizzy." It was Quirk who, on cross-examination, brought out that two of Brackman's stab wounds were inflicted after Brackman became unconscious—testimony that does not aid Crisp's self defense claim.

Quirk's representation: Quirk had represented the victim two years earlier in a disorderly conduct case; Quirk had advised a friend of Barbara Joslin, the victim's ex-wife, that Joslin did not need independent counsel at trial because the prosecutor would represent her; and Quirk told Patti Elder the Friday before the shooting how to get a peace bond against Crisp.

■ When ineffective assistance of counsel stems from conflicts of interest, the prejudice standard is slightly different. "[P]rejudice is presumed when counsel is burdened by an actual conflict of interest.... [But p]rejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and 'that an actual conflict of interest adversely affected his lawyer's performance.'" *Strickland,* 104 S.Ct. at 2067 (quoting *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980) (footnote omitted)). Even with this slightly easier prejudice standard, we do not believe Crisp has met his burden of proof.

■ First, Quirk never actively represented conflicting interests. He represented John Joslin in a completely unrelated action with which Crisp had no connection. Moreover, he informed Crisp of this and Crisp agreed that the former representation of Joslin created no problem. There is no showing that Quirk developed any sort of relationship with John Joslin as a result of this previous representation. Similarly, Quirk's contact with Patti Elder occurred before the shooting, and reportedly consisted of nothing more than directions to the prosecutor's office.[9] As for Barbara Joslin, Crisp never even talked with her—he merely told a friend of hers that Joslin would not need independent counsel at trial. Obviously no confidences were passed; Quirk's information could hardly be called legal advice.

Second, even if these three incidents qualify as potential sources of conflicts of interest, their effect was negligible. Crisp argues that these conflicts caused his attorney to fail to attempt to impeach Patti Elder. Crisp points to two persons, Thomas St. John and Linda Straham, who would have testified that Elder had a bad reputation for truth and veracity. The post-trial competency hearing, however, reveals that their testimony, if admissible at all, would have been insignificant at best. Thomas St. John could testify to Patti Elder's ex-husband's cousin's opinion of Patti Elder, nothing more. The source of Linda Straham's opinion is not much more credible; she testified at the post-trial hearing that it was based solely on the opinions of Crisp's family, one friend, and Straham's mother and two sisters. We will not grant habeas relief under these circumstances.

## IV

In summary, we have carefully reviewed the record in this case, including the transcripts of the trial and of the post-trial competency hearing. Considering the totality of the circumstances—that is, all of the evidence, witness examination and cross-examination, arguments to the court and jury, and the potential combined effect of all of Quirk's alleged errors—we find that his overall trial preparation and performance did not rise to the level of an objective standard of reasonableness, but we also find in the circumstances of this particular case that his errors and omissions were not "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland,* 104 S.Ct. at 2064. We therefore affirm the district court's denial of Crisp's petition for a writ of habeas corpus, but again take this opportunity to emphasize that defense attorneys should "not view the *Strickland* prejudice test as an excuse to exert less than a full effort on behalf of criminal defendants facing apparently inevitable conviction. While ineffective assistance that was not prejudicial to the defense may not be a

---

9. Elder and Pam Lott, a friend of hers who knew Quirk, happened to see Quirk and asked him how to stop Crisp from visiting Elder. Quirk said that Elder should get a restraining order or talk to the prosecutor.

sixth amendment violation, every criminal defendant deserves the best representation his or her defense counsel is able to provide," *McKinney v. Israel,* 740 F.2d 491 at 492 n. 2 (7th Cir.1984), and may perhaps seek to enforce this through civil proceedings if habeas corpus fails.

AFFIRMED.