**UNITED STATES of America**

v.

**Tyrone Anthony GRAY, Appellant.**

**No. 88–3606.**

United States Court of Appeals,
Third Circuit.

Argued March 7, 1989.
Decided June 22, 1989.

George E. Schumacher, Federal Public Defender, Joel B. Johnston (argued), Asst. Federal Public Defender, Pittsburgh, Pa., for appellant.

J. Alan Johnson, U.S. Atty., Paul J. Brysh (argued), Asst. U.S. Atty., Pittsburgh, Pa., for the U.S.

Before SLOVITER, BECKER and SCIRICA, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

Appellant Tyrone Gray appeals from the order of the district court denying his motion to vacate, set aside or correct sentence under 28 U.S.C. § 2255 on the ground of ineffective assistance of counsel. Gray's claim was based, *inter alia*, on his trial counsel's failure to conduct any pre-trial investigation, hire an investigator to conduct such investigation, or contact potential witnesses. We have jurisdiction under 28 U.S.C. § 1291.

"The issue of whether the representation a defendant received at trial was constitutionally inadequate is a mixed question of law and fact. We are therefore not bound by the clearly erroneous rule and we may freely review the district court's conclusion." *Morrison v. Kimmelman*, 752 F.2d 918, 923 (3d Cir.1985), *aff'd*, 477 U.S. 365,

106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) (citations omitted). Application of the two-pronged test for ineffective assistance of counsel defined in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984), " 'requires courts carefully to examine trial records in light of both the nature and seriousness of counsel's errors and their effect in the particular circumstances of the case.' " *McNeil v. Cuyler*, 782 F.2d 443, 449 (3d Cir.) (quoting *Strickland*, 466 U.S. at 702, 104 S.Ct. at 2072 (Brennan, J., concurring in part and dissenting in part)), *cert. denied*, 479 U.S. 1010, 107 S.Ct. 654, 93 L.Ed.2d 709 (1986). We thus begin with a detailed examination of the record at trial and at the post-trial evidentiary hearing on the ineffectiveness claim.

## I.

### Facts and Procedural History

Gray was indicted on February 5, 1987 under 18 U.S.C.App. § 1202 (1982) (repealed and recodified as amended at 18 U.S.C. § 922(g) (1987 Supp.)), for possession of a firearm as a convicted felon. Gray admittedly had possession of a weapon, and before trial stipulated to both the interstate commerce and prior felony aspects of the offense. At trial Gray presented the affirmative defense of self-defense, maintaining that he had taken the firearm from an assailant in the heat of a fight and that the exigencies of the situation justified his possession of it when he was apprehended by the police.[1] The jury returned a verdict of guilty against the defendant, and the District Court for the Western District of Pennsylvania sentenced Gray to the mandatory minimum sentence of fifteen years imprisonment because Gray had three or more prior violent felony convictions, *see* 18 U.S.C. § 924(e) (1987 Supp.).

Gray's conviction arose out of his arrest on August 23, 1986 by two Pittsburgh police officers who were called to the scene of the fight and who discovered a .22 caliber automatic pistol and twelve rounds of ammunition fitting this gun in the pockets of Gray's pants during a pat-down search. Gray was originally charged under state law, but these charges were subsequently dropped in favor of the federal indictment. The case proceeded to trial in federal district court on March 31, 1987, seven months after Gray's arrest. Gray was represented by attorney Michael Witherel, who was appointed by the court on February 10, 1987.

### A.

### The Trial Testimony

The government first called Officer George Roeschenthaler, who testified that he and his partner, Officer Carl Finkbeiner, responded to a "disturbance on the street" call at approximately 6:15 p.m. on August 23, 1986. Supp.App. at 2. They proceeded to a bar named Mecrecco's in the "North Side" neighborhood of Pittsburgh. Officer Roeschenthaler testified that on their arrival at the scene there was a crowd of twenty to twenty-five people assembled outside the bar in pouring rain. One member of the crowd stated, " 'It's all over now,' " and another shouted, " 'Watch out, he's got a gun.' " Supp.App. at 3. Someone pointed at an individual walking down the street, and stated that he had a gun. Roeschenthaler testified the individual designated was approximately "50 or 60 yards away" from the crowd. *Id.*

Roeschenthaler testified that he began to walk towards the individual, who hastened his steps when he saw the officer approaching. Roeschenthaler began to run and immediately caught up to him and began to pat him down. Feeling a bulge in the right rear pocket of the individual's pants, the officer reached inside and discovered a loaded .22 caliber stainless steel automatic pistol. By this time, Officer Finkbeiner

---

1. The duress or justification defense to charges of illegal possession of a firearm under 18 U.S.C.App. § 1202(a)(1) has been recognized by at least two courts of appeals. *See United States v. Panter*, 688 F.2d 268 (5th Cir.1982); *United States v. Agard*, 605 F.2d 665 (2d Cir.1979). The government does not contest that, if proven in the appropriate case, duress or justification is a complete defense.

had approached, and he continued the pat-down search and discovered twelve live rounds of loose ammunition in a front pocket of the individual's pants. Officer Roeschenthaler identified the defendant Gray as the person apprehended.

On further questioning, Roeschenthaler stated that although people had come out of the houses and businesses lining the street on which Gray was walking, so that there were people "all along" the street, Supp.App. at 8, 11, Gray was not near any other individual at the time that the officers arrived at the scene and was "away from the crowd." Supp.App. at 7. Furthermore, Gray was not injured and bore no other signs of having just been in a fight, though he did appear intoxicated. His lower trousers were not wet so that it did not appear that he had been "on the ground or fighting or rolling around." Supp.App. at 7.

Officer Finkbeiner testified next. Finkbeiner's testimony largely matched Roeschenthaler's. As Finkbeiner explained, "On our arrival it was raining pretty hard, and there was a fairly large crowd in the middle of the street and on the sidewalk.... Somebody says that everything was over, everything was okay, it was cool, and then somebody yelled that a man walking down the street had a gun. So Officer Roeschenthaler proceeded down, he called to the fellow, and the fellow walked a little bit faster than he was at first. He stopped him ... patted him down and he brought defendant back with the gun." Supp.App. at 16–17. Finkbeiner remained behind and asked questions of Mr. Mecrecco, the bartender, who had been one of the people in the crowd to warn the officers that Gray had a gun and whom Finkbeiner knew from his years of service as a police officer on the North Side. Before arresting Gray and loading him in the police van, Finkbeiner took a turn frisking him and discovered twelve loose live rounds of ammunition in a front pocket. Someone identifying himself as a relative of Gray's came up to the officers and asked to take Gray home, but the officers explained that they could not release him because of the gun.

On cross-examination, Finkbeiner continued to insist that there were no signs of a scuffle in progress when the officers arrived at the scene and that Gray was walking away, forty to fifty yards from the crowd, Supp.App. at 23, or thirty to forty yards away, Supp.App. at 26, at the time Finkbeiner first noticed him. Finkbeiner acknowledged that the department had not tested the gun found on Gray for fingerprints.

The government's last witness was William J. Oterson, a special agent with the federal Bureau of Alcohol, Tobacco and Firearms in Pittsburgh, who testified that Gray had called him several times during the course of the preparation of the federal indictment to ask questions about why the state charges brought against him were being dismissed in favor of federal charges and what the possible penalties under federal law would be. Oterson stated that Gray did not tell him that he had taken the gun from someone else in a fight until Gray gave Oterson his formal statement on February 10, 1987, which Oterson read into the record. In this statement, Gray claimed that he had taken the gun and ammunition in the course of a fight after they fell from the pocket of the individual he was fighting with, whose name he did not know. Oterson further testified that the gun in question had been traced to a purchase in 1982 in Alabama by an individual named Reba McComb, and had never been reported stolen.

On the next day of trial, counsel for the government explained to the court that Gray's counsel had the day before provided the government with a statement made by Officer Finkbeiner in a preliminary hearing held in state court on the state charges, in which Finkbeiner presented a version of the incident which differed substantially from the version to which he had just testified at trial. Finkbeiner was therefore recalled to the stand.

Finkbeiner's new testimony, based on his review of his sworn statement given on September 18, 1986, was that, upon the officers' arrival at the scene of the disturbance on August 23, 1986, Finkbeiner in

fact had observed two men in the process of fighting in the middle of the street. Finkbeiner rolled down the window on his side of the police van and told the two men to break it up. The two men were "[t]en, fifteen feet" away from the officers, Supp. App. at 59, not thirty to forty yards away as Finkbeiner had testified the day before. When the two men persisted in fighting, the two officers got out of their vehicle and Roeschenthaler took Gray over to the van. The bartender from the bar came over to Finkbeiner and warned him that Gray had a gun. Roeschenthaler frisked Gray and discovered the .22 caliber pistol in his right rear pocket. Finkbeiner then discovered the twelve rounds of ammunition in a front pocket.

Finkbeiner explained that his testimony at trial the day before contradicted his description of the incident as he now recalled it because his earlier trial testimony had been based on his review of a statement he had given Agent Oterson several months after the incident occurred. Officer Roeschenthaler was then recalled to the stand and stated that his testimony of the day before was from present recollection and that he had nothing to add in light of Finkbeiner's renunciation of his earlier testimony. The government rested its case.

The defense called as its first witness the public defender who represented Gray in the preliminary hearing in state court. This witness testified that Gray told her on September 18, 1986 that he had taken the gun found on him from another person in the course of a fight.

Gray's second witness was his brother, Sherwood Robinson, who had apparently been sequestered by government request during the prior testimony. Trial Transcript at 16. Robinson testified that August 23, 1986 had been his fortieth birthday, and he and Gray had gone out to celebrate it. The two went to Mecrecco's, a bar Robinson often frequented, and began to shoot pool and drink. After an hour or two, Gray left the bar to get some air. Robinson remained inside until the bartender told him that his companion was outside fighting. Robinson ran outside and saw his brother and another man fighting on the ground on the sidewalk in front of the bar. Robinson testified that he saw a silver object, a gun, and bullets laying around it on the sidewalk, and witnessed his brother and the other individual reaching for it. Robinson ran up behind Gray and attempted to pull him away. Gray grabbed the gun and the bullets from the ground and told the man he was fighting with, in obscene language, that he intended to make him eat the gun. Robinson testified that he continued to restrain Gray and Gray, while retaining his hold on the gun, continued to struggle against him and demand that his brother let him go. The man with whom Gray had been fighting hit Gray in the face and ran away. "About a minute" later, Supp.App. at 89, while Robinson was still struggling with his brother, the police arrived. Robinson told Gray to put the gun in his pocket and went back inside the bar. A short time later he was told that his brother had been arrested.

On cross-examination, Robinson testified that he did not know the man with whom his brother had fought and had never seen him before, that both he and his brother "were high" at the time of the incident due to their alcohol consumption, and that he did not go back to talk to the police after hearing that his brother had been arrested.

Defendant Gray took the stand as the final witness and testified that although he did not often go to the North Side except to visit his son, he went with his brother to a bar in that neighborhood on the day in question to celebrate his brother's birthday. Gray testified that he became overly intoxicated by drinking vodka, stepped outside to get some air, and encountered a former girlfriend, Francine, with whom he started to argue. As Francine started to walk away, a man whom Gray did not know came up to them. Gray and this man began to exchange words and the man hit Gray in the face. Gray testified that he "dove straight into him," Supp.App. at 99, and grabbed his leg and pulled him off balance. Gray saw the man begin to pull a gun from his back pocket and pushed the man to the ground, knocking the gun out of his hand. The two kept tussling and

reaching for the gun. Bullets also fell out of the other man's pocket. Gray's brother grabbed him and Gray reached for the gun and bullets, though, Gray acknowledged, "I don't remember how I ended up with the bullets." Supp.App. at 102. The man Gray had been fighting with hit Gray and Gray threatened to "ram [the gun] down his throat." Supp.App. at 103. As Gray acknowledged, "I would have shot him, but I didn't even know if the gun was loaded." *Id.* As Gray continued to curse at his brother, he saw the police approach. Gray heard his brother say " 'Put it away,' " Supp.App. at 104, and he put the gun and bullets in his pocket. Gray testified that he did not simply hand the gun over to the police because he was afraid the police would shoot him if they saw him waving it around and did not drop it because he was afraid it might discharge.

## B.

### *The Evidentiary Hearing*

On September 2, 1987, Gray filed a *pro se* motion under 28 U.S.C. § 2255 to vacate his sentence on the ground of ineffective assistance of counsel. The court appointed Gray new counsel from the federal public defender's office and granted Gray an evidentiary hearing, which commenced on April 15, 1988.

Gray testified that he first met his prior counsel, Witherel, at his arraignment on the federal charges in February 1987 and visited Witherel at his office the following week. The two discussed Gray's case and Witherel instructed Gray to obtain the names of potential witnesses to the incident. Gray gave Witherel his brother's name. Approximately two weeks later, Gray called Witherel and gave him the names of Sonny Crosby, Annie Green, and Denise LaBelle as witnesses to the incident. Gray had returned to the bar area and spoken to these individuals and believed they might be willing to testify.

Witherel did not ask Gray how these witnesses could be contacted but instead told Gray to bring them to his office for an interview. Gray testified that he attempted to do so but that none ended up showing up for the meeting. Gray also spoke to Francine Heath about testifying, but the two were not on good terms and Heath told Gray that she "didn't want[ ] to be bothered." App. at 105. Gray therefore brought only his brother, Sherwood Robinson, to his next meeting with Witherel, which took place approximately a week before trial. Witherel and Gray discussed the use of a self-defense theory at trial, and Witherel again urged Gray to locate witnesses on his behalf.

Gray testified that he tried to secure the presence at trial of the three witnesses whose names he had given Witherel, but again none showed up. Gray was unable to contact Denise LaBelle, who had attended his preliminary hearing in state court, and could not track down Annie Green, who apparently did not always have a fixed address. When Crosby failed to show up on the day of trial, Gray phoned him and Crosby explained that he did not want to testify because he had "some back paper with the Feds." App. at 106. Gray testified that he was aware that Witherel had the power to subpoena witnesses but "wasn't real anxious" to ask him to do so, instead feeling that he should comply with Witherel's instructions to secure the voluntary presence of as many witnesses as he could. App. at 108. After the close of evidence, while the jury was deliberating, Gray noted to Witherel that the bartender whom the officers had mentioned in their testimony might have been an impartial witness who should have been called.

Robinson testified next, explaining that he had accompanied his brother to a meeting with Witherel in late March, 1987 in which Witherel stressed that Gray had to locate and bring in more witnesses. The meeting lasted approximately twenty minutes.

Following a two-week continuance granted to allow Gray's attorney to seek additional witnesses, the evidentiary hearing reconvened and Francine Heath was called to the stand. Heath testified that she had formerly been involved with Gray and had a son by him. Her son had called her at work on August 23, 1986 and informed her

that he and her then-current boyfriend, Joseph Johnson, had encountered Gray on the street and Gray and Johnson had begun arguing after Gray asked Johnson what his son was doing with him. Gray had wanted his son to accompany him and Johnson had refused to let him go, and Johnson and Gray had almost begun to fight.

Concerned, Heath left work and returned home to the apartment which she and Johnson shared, which was located six houses from Mecrecco's bar. She discovered Johnson in the living room in a "very agitated" state. App. at 125. Johnson paced the floor and threatened, "if he messes around with me, he's going to find hisself dead. I'll kill him." *Id.* Johnson went into a closet and Heath saw him shut and lock a metal box he kept there. He left the closet and continued to swear and pace around the apartment, "patting his pocket," and repeating that he was going to kill Gray if he continued to "mess around" with him. App. at 127. Heath acknowledged that she did not know what Johnson kept in the metal box, but suspected that he had taken a weapon out of it because of the way in which he was "fiddling with his back pocket." App. at 130.

Heath left the apartment to return to work, leaving Johnson behind. On the way to the car stand, Heath encountered Gray outside of Mecrecco's bar. Gray demanded an explanation as to the man with whom he had seen his son. Heath suddenly saw Johnson approach from behind her and "fl[y] on" Gray. App. at 131. The two began to fight. Johnson attempted to choke Gray with a pool stick and the two fell to the ground and began to roll around. Heath saw Gray's brother come out of the bar and attempt to restrain Gray. After the two had been separated, Heath tried to persuade Johnson to leave but Gray called after him. Johnson took a swing at Gray and knocked him down. Heath and Johnson then left the scene and returned to their apartment. From her apartment house door, Heath saw that the police had arrived. Heath testified that she did not see a gun during the fight, but she stated that she wore glasses and did not have them on at the time. She further testified

that she and Gray still did not get along, and that she had not seen him after the fight until the week before, when she had taken their son to visit Gray in jail and Gray had asked her to testify for him. She was no longer involved with Johnson, whom she had broken up with after he pulled a knife on her.

Gray's final witness was Robert Larry Jones, who testified that he was acquainted with Gray from having seen him occasionally in the "Hill District" (another neighborhood in Pittsburgh where Gray lived) but was not a close friend of his. Jones testified that he had travelled to the North Side on August 23, 1986 in the course of his work as a jitney driver. After buying a pack of cigarettes in a nearby drug store, Jones observed two men fighting outside a bar. He recognized one man as Gray but did not know the other. Jones testified that he witnessed "Mr. Gray body-slam another guy, and the guy he slammed ... I saw a gun come out of his pocket when he hit the ground. And I saw Mr. Gray pick the gun up." App. at 141. Jones did not see Gray again until he encountered him in the county jail two weeks before the hearing, where Jones was incarcerated. Gray explained why he was in jail to Jones and Jones recalled having seen the fight. Gray's counsel then interviewed Jones and asked him to testify at the hearing.

The government called Michael Witherel as its only witness. Witherel testified that from the beginning Gray maintained that he had obtained the gun from the another individual in a fight, and that Witherel stressed the need to obtain witnesses to the incident. Since Gray had been released on bond, Witherel asked him to return to the bar and investigate potential witnesses. Witherel stated that his notes reflected that he and Gray discussed the names of several potential witnesses over the following few weeks. According to Witherel, he and his client were in contact "between six and ten times" during this period. App. at 155. After meeting with Robinson and discovering that he had seen only part of the fight, Witherel told Gray, "if we can't get some other people in and all we have is

your brother ... you'll go to jail. And we discussed that at length." App. at 158.

They then discussed "getting the bartender in." App. at 156. Witherel's notes reflected that the names of Sonny Crosby, Annie Green, someone named Joe, and someone named Smittee were also mentioned. Gray's brother was going to make arrangements to have one of these witnesses come in. Annie Green was identified as a street person who might not be reliable, and Crosby had "some sort of a problem with the authorities and he didn't want to come into Federal Court." App. at 157. It was Witherel's understanding, however, that these two individuals were "going to come in[,] ... [b]ut then, the day of the trial they weren't there." App. at 161. Witherel testified that he asked Gray to "make arrangements, I think I gave him some of my cards, to have these people call me, but I'm not sure about that. Or, he had my phone number, and to at least have these people call me, so that I can interview them over the telephone to find out what they knew." *Id.*

Witherel and Gray also discussed Francine Heath, but Gray told Witherel "that she would not be of help and would not testify for him; that they did not have a good relationship, and he really didn't trust how she would testify." App. at 157. Throughout their discussions, Gray continued to insist that he had no idea who the man who had assaulted him was, though Witherel suggested that Gray attempt to find out more about him through Heath or by asking at the bar.

Witherel testified that he discussed with Gray the possibility of subpoenaing witnesses but that Gray's "attitude at the time was he didn't want[] to subpoena people and force them to come in to testify." App. at 157. On the day of trial, when Witherel discovered that only Robinson had shown up to testify, Witherel "expressed a lot of concern." App. at 162. Witherel could not remember if he and Gray discussed subpoenaing witnesses at this time, "[b]ut I remember consistent throughout, Tyrone's attitude was, if he had to subpoena them and force them in, then he didn't think that they would do him any good." App. at 162.

On cross-examination, Witherel admitted that his notes did not reflect the dates or times of the six to ten contacts he claimed to have had with his client prior to trial. He further admitted that he had only recently learned that persons subpoenaed to testify in federal court could receive a witness fee to compensate them for their time and expenses, and that he did not tell Gray about the witness fee when they discussed the possibility of obtaining subpoenas. He explained that such compensation would not have been available for defense witnesses in state court, where Witherel was apparently accustomed to practicing.

Witherel admitted that he did not visit the scene of the incident or make any other effort to locate potential witnesses. Moreover, he made no attempt to hire an investigator to search for such witnesses, although he was aware that he could have made a motion to obtain funds to hire such an investigator. Finally, Witherel acknowledged that he had made no discovery requests other than an informal call to the prosecuting attorney to obtain whatever information he had.

## C.

### *The District Court's Opinion*

Applying the first prong of the two-part test of *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), the district court found that Witherel's performance in conducting a reasonable pretrial investigation or determining that such an investigation was not necessary was so "severely deficient" as to fail even the deferential test of attorney competence laid out in *Strickland.* App. at 200. Citing Witherel's testimony that he did not make any attempt to locate witnesses or to hire an investigator, the court found that Witherel completely "abdicated his duty to conduct a pretrial investigation and left it entirely up *to Gray himself* to conduct the pretrial investigation." *Id.* (emphasis in original).

The court denied Gray's petition to vacate his sentence, however, on the ground that Gray failed to show that Witherel's failure to conduct a reasonable pretrial investigation prejudiced the outcome of the trial. The court found that neither Heath's nor Jones' testimony served to make the requisite showing. Heath's testimony "in all probability, would not have changed the outcome" at trial because she testified that she had not seen a gun at any time. App. at 204. The court stated that, on the other hand, Jones' testimony that he had seen a gun fall from the other individual's pocket during the course of the fight would have had a reasonable probability of changing the outcome if Jones had been called to testify. However, since it was apparent that no one, including Gray, was aware that Jones had witnessed the incident until after Gray was convicted, there was no plausible basis for concluding that Witherel would have located this witness even if he had conducted a reasonable pretrial investigation. The court held that therefore Gray failed to show that he had been prejudiced by the ineffectiveness of his counsel, and denied his petition.

## II.

### Discussion

### A.

### Applicable Legal Principles under Strickland

As *Strickland v. Washington* instructs, this court must inquire whether "counsel's representation fell below an objective standard of reasonableness," 466 U.S. at 688, 104 S.Ct. at 2064, and, if so, whether there is a "reasonable probability" that the ineffectiveness prejudiced the outcome at trial, *id.* at 694, 104 S.Ct. at 2068.

■ In assessing an attorney's performance, courts must be "highly deferential," and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at

689, 104 S.Ct. at 2065 (citing *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)).

■ In the context of defense counsel's duty to investigate, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690–91, 104 S.Ct. at 2065–66. The reasonableness of counsel's actions may be affected by the defendant's actions and choices, and counsel's failure to pursue certain investigations cannot be later challenged as unreasonable when the defendant has given counsel reason to believe that a line of investigation should not be pursued. *Id.* at 691, 104 S.Ct. at 2066.

■ In assessing prejudice, the appropriate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695, 104 S.Ct. at 2068. This standard of proof is not as high as the standard applied to a motion for a new trial based on newly discovered evidence under Fed.R.Crim.P. 33, since, as the Court stated in *Strickland*, the high standard for newly discovered evidence claims presupposes there was an accurate and fair proceeding. *Id.* at 693–94, 104 S.Ct. at 2067–68. A defendant must show diligence in order to succeed on a newly discovered evidence claim, *see Government of Virgin Islands v. Lima*, 774 F.2d 1245, 1250 (3d Cir.1985), a showing that cannot be made when the ineffective assistance of counsel claim is based on a lack of diligence. Therefore, in ineffective assistance of counsel claims, the defendant need only show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694, 104 S.Ct. at 2068. A reasonable probability is one "sufficient to undermine confidence in the outcome." *Id.*

■ The effect of counsel's inadequate performance must be evaluated in light of the totality of the evidence at trial: "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696, 104 S.Ct. at 2069; *see also United States v. Agurs,* 427 U.S. 97, 113, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976) ("if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt").

## B.

### *Application of the First Prong of Strickland*

■ As *Strickland* explains, the range of reasonable professional judgments is wide and courts must take care to avoid illegitimate second-guessing of counsel's strategic decisions from the superior vantage point of hindsight. 466 U.S. at 689, 104 S.Ct. at 2065. It is therefore only the rare claim of ineffectiveness of counsel that should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance. *See Strickland,* 466 U.S. at 689–90, 104 S.Ct. at 2065–66; *see also Sullivan v. Fairman,* 819 F.2d 1382, 1391 (7th Cir.1987) ("[F]ew petitioners will be able to pass through the 'eye of the needle' created by *Strickland.*" (citation omitted)).

■ However, "the Supreme Court certainly did not intend the *Strickland* analysis to be a total barrier to relief." *Id.* at 1391. Where the deficiencies in counsel's performance are severe and cannot be characterized as the product of strategic judgment, ineffectiveness may be clear. Thus, the courts of appeals are in agreement that failure to conduct any pretrial investigation generally constitutes a clear instance of ineffectiveness. *See, e.g., Sullivan,* 819 F.2d at 1391–92 (perfunctory attempts to contact witnesses not reasonable); *Code v. Montgomery,* 799 F.2d 1481, 1483 (11th Cir.1986) (counsel's performance fell below competency standard where he interviewed only one witness); *Nealy v.*

*Cabana,* 764 F.2d 1173, 1177 (5th Cir.1985) ("[A]t a minimum, counsel has the duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case."); *Crisp v. Duckworth,* 743 F.2d 580, 583 (7th Cir. 1984), *cert. denied,* 469 U.S. 1226, 105 S.Ct. 1221, 84 L.Ed.2d 361 (1985) ("Though there may be unusual cases when an attorney can make a rational decision that investigation is unnecessary, as a general rule an attorney must investigate a case in order to provide minimally competent professional representation."); *Thomas v. Lockhart,* 738 F.2d 304, 308 (8th Cir.1984) (investigation consisting solely of reviewing prosecutor's file "fell short of what a reasonably competent attorney would have done"); *see also United States v. Debango,* 780 F.2d 81, 85 (D.C.Cir.1986) (suggesting that ineffectiveness shown by complete failure to investigate but finding no prejudice in case before it).

Ineffectiveness is generally clear in the context of complete failure to investigate because counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made. *See Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2065–67; *see also Debango,* 780 F.2d at 85 ("The complete failure to investigate potentially corroborating witnesses ... can hardly be considered a tactical decision"); *Sullivan,* 819 F.2d at 1389; *Nealy,* 764 F.2d at 1178; *Crisp,* 743 F.2d at 584.

■ Such is the situation presented in this case. Counsel offered no strategic justification for his failure to make any effort to investigate the case, and indeed he could have offered no such rationale. As he admitted, he did not go to the scene of the incident to interview potential witnesses, even though, as the police officers testified, there were as many as twenty-five eye witnesses to the altercation. Potential eyewitnesses included many persons who would have been easily located, such as the bartender and people who came out of their houses to observe the disturbance. Although Gray's trial counsel was not ap-

pointed until almost six months after the arrest, his failure to take any steps to investigate the case cannot be excused on the ground that investigation would have been fruitless. The large number of eyewitnesses make it reasonable to assume that, had he pursued his duty to investigate, some information would have still been discoverable.

Moreover, Gray's counsel had the names of at least four witnesses, including Francine Heath, who had witnessed the altercation, yet he made no effort to contact any of these known witnesses. Cf. Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987) (counsel's decision not to mount an all-out investigation was supported by reasonable professional judgment where he interviewed all potential witnesses brought to his attention and made strategic decision against further pursuit of that line of investigation). Nor did Witherel hire an investigator to track down these or other potential witnesses, despite his awareness that he could have petitioned the court for funds for this purpose.

In his testimony at the evidentiary hearing, Witherel stressed that his client's consistent attitude was that "he didn't [ ]want to subpoena people and force them to come in to testify." App. at 157. Gray's reluctance to subpoena witnesses to compel their attendance at trial, however, did not absolve Witherel of his independent professional responsibility to investigate what information these potential witnesses possessed, even if he later decided not to put them on the stand. Moreover, Gray's reluctance to force witnesses to testify was based on inaccurate information, since his counsel did not know and therefore failed to inform him that subpoenaed witnesses were entitled to compensation for their trouble. This therefore is not a case in which the defendant made an informed decision which precluded counsel from having a duty to pursue a given line of investigation. Cf. Strickland, 466 U.S. at 691, 104 S.Ct. at 2066.

Under the circumstances, counsel's behavior was not colorably based on tactical considerations but merely upon a lack of diligence, as the government has conceded. We therefore independently reach the same conclusion as did the district court that counsel's complete abdication of the "duty to investigate" recognized in Strickland, see 466 U.S. at 690, 104 S.Ct. at 2066, caused his performance to fall below the minimum standard of reasonable professional representation.

## C.

### Strickland's Second Prong: Prejudice

■ Of course, the fact that counsel was ineffective is not in itself sufficient to grant relief under Strickland. Under Strickland's second prong, Gray must establish a reasonable probability—one sufficient to undermine our confidence in the outcome—that the jury's verdict would have been different if not for counsel's errors. See Strickland, 466 U.S. at 695, 104 S.Ct. at 2068. Such a showing may not be based on mere speculation about what the witnesses Witherel failed to locate might have said. Cf. United States v. Valenzuela–Bernal, 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982) (in witness deportation context, defendant required to make at least some plausible showing of how testimony of unavailable witness would have been both material and favorable). "Under usual circumstances, we would expect that ... information [obtainable through an adequate investigation] would be presented to the habeas court through the testimony of the potential witnesses." United States ex rel Cross v. DeRobertis, 811 F.2d 1008, 1016 (7th Cir. 1987).

Here, we are not presented with the problem of ascertaining what unavailable witnesses would have testified to, however, because Gray has offered evidence as to the testimony available from a witness, Francine Heath, whom Witherel knew of but failed to interview. Cf. United States v. DeBango, 780 F.2d 81, 86 (D.C.Cir.1986) (record failed to support claim of prejudice where appellant failed to introduce evidence of what the witness whom counsel failed to locate would have said). Signifi-

cantly, of all of the potential witnesses known to Witherel, Heath was probably the one for whom counsel's assistance in interviewing was most needed, since Gray was not on good terms with her.

Viewing Heath's testimony as evidence of the information Witherel would have obtained had he conducted a reasonable investigation, we must assess this evidence in relation to the record as a whole, *McNeil v. Cuyler*, 782 F.2d 443, 450 n. 2 (3d Cir.1986), to determine whether there is a reasonable probability that such evidence, if presented to a jury acting "conscientiously...and impartially," would have led the jury to have a "reasonable doubt" respecting Gray's guilt. *Strickland*, 466 U.S. at 695, 104 S.Ct. at 2068.

We note at the outset that the government's evidence in rebuttal to Gray's self-defense claim was thin. *Cf. Debango*, 780 F.2d at 85 (no prejudice where evidence against defendant was compelling). The prosecution offered only three witnesses, none of whom actually observed the inception of the fight leading to Gray's arrest and none of whom was able to rebut Gray's claim that Johnson was the assailant and that the gun fell from Johnson's pocket. Moreover, Officer Roeschenthaler's version that Gray was walking away from the scene with the gun in his pocket flatly contradicted the testimony of all other witnesses. Officer Finkbeiner recanted his testimony to that effect on the second day of trial, and his testimony that the police intervened in a still ongoing fight is consistent with Gray's testimony that he was not leaving the scene with the gun when the police arrived. It is also significant that Officer Finkbeiner so testified at a

time closer to the event when his memory was likely to be fresher.

On the other hand, Gray's and his brother's consistent testimony was that the gun fell from Johnson's pocket during the fight. The jury's verdict against Gray suggests that it did not find this testimony credible. Other evidence may also have led the jury to disbelieve Gray's account, such as the twelve bullets found in Gray's front pocket, which Gray claimed to have scooped up in the heat of the fight. Heath's testimony, however, might have been of significance on the credibility issue.

First, Heath's testimony would have explained the identity of Gray's attacker and established that a prior antagonism existed between the two men. This would have made Gray's and Johnson's testimony more credible, and without it, the identity of Gray's assailant and his motivation for attacking Gray remained completely unexplained. Admittedly, it would have also cast some doubt on Gray's claim that he did not know his assailant, but it was not irretrievably inconsistent since Gray may not have recognized Johnson from their prior brief encounter. Second, Heath's testimony was material with respect to the issue of the state of mind of Gray's attacker, as it showed that Johnson made repeated threats to "kill" Gray shortly before he attacked him, which would have borne on Gray's defense to possession of the gun on grounds of self-defense. *Cf. McNeil*, 782 F.2d at 450–51 (no prejudice where there was virtually no evidence to support theory that defendant was in fear when he shot victim).[2] Third, Heath's testimony could have led the jury to infer that Johnson was carrying a firearm immediately before the

---

**2.** The government argues that Gray's and Robinson's testimony that Gray told Johnson that he wanted to "ram [the gun] down his throat," App. at 103, demonstrated that Gray "had become the aggressor," and was no longer entitled to rely on the self-defense justification. Brief for the United States at 14. The sequence of events is not entirely clear from Gray's and Robinson's testimony, but the jury could have found that Gray's threat to harm Johnson with the gun occurred in the context of Johnson's assault on Gray while Gray's brother held him in restraint. *See*

Supp.App. at 79. Thus, under the defense's version of events, in which only "about one minute" passed between the time Johnson stopped his assault and the police arrived, Supp.App. at 89, self-defense would have been a viable theory under *United States v. Panter*, 688 F.2d at 270–71. *Cf. United States v. Stover*, 822 F.2d 48, 50 (8th Cir.1987) (defense of justification not available where assailant left scene and defendant retained gun while no longer in imminent danger).

fight, another indispensable element of Gray's self-defense theory.

Finally, Heath's testimony would have provided an additional, less interested witness to corroborate the defense's version that Johnson attacked Gray. *See Nealy,* 764 F.2d at 1180 (where testimony of missing witnesses directly contradicted prosecution witness and supported defense's theory of the case, defendant met his burden of showing prejudice). Although Heath, as the mother of Gray's son, cannot be said to be a completely disinterested witness, *cf. Montgomery v. Petersen,* 846 F.2d 407, 415 (7th Cir.1988) (completely disinterested witness could alter jury view of otherwise unimpeachable testimony), she testified that she and Gray had no continuing relationship and in fact did not get along. This is confirmed by Witherel's testimony that Gray said that he and Heath were not on good terms. Inasmuch as no government witness testified to the facts that were exclusively within Heath's knowledge, we need not engage in weighing Heath's credibility against that of the government witnesses. *Cf. id.*

The district court dismissed the significance of Heath's testimony on the ground that, having not actually seen a gun at any point, Heath could not directly corroborate Gray's story. However, the government also did not offer any witness who saw the gun during the fight, and therefore the district court's rationale for discounting Heath's testimony is not persuasive. Our assessment of the record leads us to conclude that it is reasonably probable that the jury's verdict would have been altered by the presentation of Heath's testimony.

In summary, we find that the defendant has met his burden of showing a reasonable probability that the outcome of his trial would have been different had his counsel not failed in his duty to investigate the evidence obtainable from Heath in light of the significance of this evidence in providing background information, corroborating the defendant's theory of the case, and casting doubt on a weak government case. We conclude that the district court's hold-ing that Gray's counsel's ineffective assistance did not prejudice Gray cannot stand.

### D.

#### *The Effect of Jones' Testimony*

Since we find Heath's testimony to be sufficient to meet the *Strickland* standard, we need not reach that portion of the district court's order holding that Jones' testimony could not serve as the basis for granting relief to Gray because there was no evidence that this witness would have been found through an effective investigation. We therefore leave to another day the interesting issues raised by the district court's analysis of the showing required to offer a potential but then-unknown witness to demonstrate the type of information available from a more effective investigation.

### III.

#### *Conclusion*

For the foregoing reasons, the order of the district court denying Gray's motion under 28 U.S.C. § 2255 will be reversed, and this case will be remanded with directions to grant Gray's motion to vacate, set aside or correct the sentence and to grant Gray a new trial.