Commer GLASS, Petitioner,

v.

Donald T. VAUGHN, et al., Respondents.

Civ. A. No. 91–0963.

United States District Court,
E.D. Pennsylvania.

July 13, 1994.

202

Stephen A. Whinston, Berger & Montague, P.C., Philadelphia, PA, for petitioner.

Elizabeth J. Chambers, Dist. Attys. Office, Donna G. Zucker, Philadelphia, PA, for respondents.

### MEMORANDUM AND ORDER

YOHN, District Judge.

Petitioner, Commer Glass, filed a habeas corpus petition pursuant to 28 U.S.C. § 2254. Petitioner asserts that he is entitled to habeas corpus relief because his trial counsel was constitutionally ineffective. The reason alleged for the ineffectiveness is that counsel failed to investigate and pursue a defense that petitioner's post-traumatic stress disorder ("PTSD") negated his ability to form the requisite criminal intent for the charge of murder in the first degree of which he was convicted.

After receiving an initial report and recommendation, the court ordered the magistrate judge to whom this matter was referred to conduct an evidentiary hearing on whether petitioner's trial counsel was constitutionally ineffective and, if so, whether this ineffectiveness was a miscarriage of justice. The magistrate judge held the evidentiary hearing and issued a report and recommendation which concluded that petitioner's trial counsel rendered constitutionally ineffective assistance and that petitioner suffered a fundamental miscarriage of justice therefrom. As a result of this conclusion, the magistrate judge recommended that the petition for habeas corpus be granted.

The respondents filed objections to the report and recommendation requesting that the court reject the report and recommendation and deny the petition. An evidentiary hearing was held by the court on February 18, 1994 in order to aid the court in its review of the report and recommendation. At that hearing, the court heard petitioner's testimony. The parties considered the possibility of additional psychiatric testing by Dr. Sadoff and requested that the court delay its decision pending an agreement concerning the terms and conditions of such testing. Subsequently the parties advised the court that they could not agree on those terms and conditions and that the court should proceed with its disposition of the petition.

### STANDARD OF REVIEW

This matter was referred to the magistrate judge for a report and recommendation pursuant to Rule 7(I)(e) of the Local Rules of Civil Procedure and 28 U.S.C. § 636(b)(1)(B). When a district court reviews rulings of a magistrate judge made pursuant to 28 U.S.C. § 636(b)(1)(B), it conducts a de novo review of the proposed findings and recommendations of the magistrate

judge. *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 91 (3d Cir.1992); 28 U.S.C. § 636(b)(1)(C); L.R.Civ.P. 7(IV)(b). When conducting its review, the court may accept, reject or modify, in whole or in part, the findings and recommendations of the magistrate judge. *Id.* The district court can also receive further evidence or recall witnesses if it deems it necessary. *Id.*

## FACTUAL FINDINGS

The respondents do not object to the majority of the findings of fact in the report and recommendation. Instead, they object to the inferences that the magistrate judge drew from these findings. Based on the complete record before the court, it hereby makes the following findings of fact:

On November 30, 1976, a jury in the Court of Common Pleas, Philadelphia County found petitioner guilty of murder in the first degree for the stabbing death of Billie Ann Morris. (Pl.'s Ex. 1 at 403). Petitioner was sentenced to life imprisonment. (*Id.*, 4/7/77 Tr. at 26).

On the night the victim was killed, petitioner was arrested and charged with her murder. (Tr. 5/26/93 at 59). Petitioner denied killing Ms. Morris in a statement given to the police the morning after his arrest. Petitioner stated to the police that he went to Deborah Young's apartment in search of marijuana and unexpectedly saw the victim.[1] (Pl.'s Ex. 13; Tr. 5/26/93 at 115). Petitioner further stated to the police that he agreed to go to the victim's apartment to get some drugs and that each was going to take their own car. (*Id.*). Petitioner told the police that he drove to the victim's apartment but that she failed to appear. Petitioner stated that he then returned approximately twelve minutes later to where he had last seen the victim and found her stabbed and bleeding. (*Id.*). Petitioner picked up the victim and took her to the hospital. (*Id.*).

After a preliminary hearing, the charges against petitioner were dismissed. (Tr. 5/26/93 at 60). However, petitioner was re-arrested. (*Id.*). Petitioner's wife, Phyllis Glass,[2] retained Barry Denker, Esquire for petitioner's bail hearing. (*Id.* at 204–07). When Phyllis Glass initially met with Denker, they failed to talk about petitioner's case. (*Id.* at 204). Instead, Denker advised Phyllis Glass where she could sell her valuables in order to pay his fee. (*Id.*). Phyllis Glass never spoke to Denker again. (*Id.* at 205).

Denker represented petitioner at the second preliminary hearing on May 26, 1976 and May 27, 1976. During the preliminary hearing, petitioner told Denker that he should speak with his wife and Stephanie Hill in order to find out about the type of person he was. (*Id.* at 62). Denker never attempted to interview these two people.

The victim's sister, Evelyn Jones, testified at the second preliminary hearing that she was involved in a physical relationship with petitioner in Philadelphia during 1969 or 1970. (Pl.'s Ex. 1, Tr. 5/27/76 at A–37). In response to this testimony, petitioner informed Denker that he was "in the service" at that time. (Tr. 5/26/93 at 128; Tr. 2/18/94 at 14). Even though petitioner informed Denker that he was in the service, he did not tell Denker that he served in Vietnam or about his combat experiences there because he was not proud of these experiences and he was not asked. (*Id.* at 129).

Petitioner saw significant combat duty in Vietnam. During combat, he saw many soldiers, including some close friends, in his outfit killed. There are two experiences which continue to stand out in petitioner's mind. One experience involved petitioner's shooting a grenade into an area where he had seen movement after a close friend was killed in a firefight. Upon investigation of the area where he had shot, petitioner learned he had killed a woman and some children. (Tr. 5/26/93 at 31–33). The other experience involved petitioner and some other soldiers being approached by some Vietnamese women while on a patrol to setup an outpost. After having a sexual encounter

---

1. At the May 26, 1993 evidentiary hearing, petitioner testified that he went to Deborah Young's apartment in search of needles so that he could do drugs. (Tr. 5/26/93 at 56).

2. Formerly Phyllis Brown, she became petitioner's wife on August 2, 1978. Prior to their marriage, they had lived together since 1973. (Tr. 5/26/93 at 190–91).

with one of the Vietnamese women, petitioner thought he saw another woman make a threatening gesture toward another soldier. Reacting instinctively, petitioner killed the woman. (*Id.* at 30).

Following the second preliminary hearing, petitioner was released from prison on bail. Petitioner proceeded to pay Denker directly for his services on a weekly basis. (Tr. 5/26/93 at 61–62, 205). The weekly payments usually involved a brief meeting with Denker during which time Denker would advise petitioner not to worry and that everything was "all right." (*Id.* at 137, 139).[3] In total, petitioner estimates he paid Denker between $4,000 and $5,000 for his services. (Tr. 2/18/94 at 17).

Before and during trial, petitioner provided Denker with a version of his movements on the night of the murder consistent with his previous police statement. (Tr. 5/26/93 at 115; Tr. 2/18/94 at 11–12). Petitioner never told Denker a different story in spite of the fact he believed it may have been possible he committed the murder. (Tr. 5/26/93 at 123). Petitioner also never told Denker of his episodes of bizarre behavior, including blacking-out, after returning home from Vietnam. (*Id.* at 117; Tr. 2/18/94 at 14). Moreover, none of petitioner's relatives or friends ever attempted to contact Denker in order to provide him with any information that may have been relevant to some form of psychiatric defense. In essence, no person volunteered any information to Denker and Denker never sought any information that would have alerted him to the possibility of a psychiatric defense.

Denker's investigation into petitioner's case was limited to the events of the day that the murder occurred. (Tr. 2/18/94 at 14). The investigation consisted of speaking with petitioner about the crime on no more than three occasions and driving petitioner along the route described in his police statement. (Tr. 5/26/93 at 137, 139). There are a number of things that Denker failed to do prior to trial. These included: (1) failing to discuss trial strategy with petitioner (*Id.* at 62); (2) failing to discuss the possible defenses

from which petitioner could choose (Tr. 2/18/94 at 16); (3) failing to discuss the various degrees of murder that existed at that time and the possible penalties petitioner could face if convicted of each degree of murder (*Id.*); (4) failing to discuss or investigate petitioner's relationship with the victim (Tr. 5/26/93 at 62); (5) failing to discuss or investigate petitioner's personal background, including his military experiences (*Id.* at 62); (6) failing to speak with petitioner's wife, Stephanie Hill or Calvin Pompei about petitioner's behavior, even though petitioner asked Denker to speak with these three people (*Id.* at 62–63); (7) failing to speak with or investigate petitioner's behavior with other friends such as John Turner, James Curry and Janice Walker even though all three were available to testify and would have done so if asked (*Id.* at 141–178); and (8) failing to investigate petitioner's mental status despite the fact that the victim's diary, which was read at the second preliminary hearing, included a passage that petitioner "is losing his mind and it scares me to death." (Pl.'s Ex. 1, Tr. 5/27/76 at A–33).

The case proceeded to trial with Denker representing petitioner. When Denker reported to the trial court on November 18, 1976 he stated that because of another trial he was not prepared to start and that he had not looked at this case. (Pl.'s Ex. 1. Tr. 11/18/76 at 3–5).

Petitioner's trial began five days later on November 23, 1976. At trial, the prosecution presented thirteen witnesses. Among the testimony heard was that of the three women who were in the house with the victim prior to her death. These three women testified that they received a phone call alerting them to the stabbing a few minutes after the victim and petitioner left the apartment. When the women investigated outside, they discovered the victim's car keys and a pool of blood. (Pl.'s Ex. 1 at 119, 155). Two residents across the street from the stabbing testified that after hearing a scream, they went to their window and saw a man place or help a woman into a car which matched the description of the car petitioner was driving.

---

**3.** Petitioner claims he would spend approximately a half hour in Denker's office each week. This half hour included the time he spent waiting in Denker's reception area. (Tr. 2/18/94 at 17).

(*Id.* at 215, 222). Finally, a nurse at Germantown Hospital testified that a black male brought the victim into the hospital. This man responded to all of her questions about the incident by saying "I don't know." (*Id.* at 182–83).

The defense offered no witnesses at trial. Petitioner states that Denker told him not to testify. (Tr. 5/26/93 at 66). Instead, Denker presented an argument that was consistent with petitioner's police statement. Denker's argument was that when the victim was killed, petitioner was at her house waiting for her and upon his return, he found the victim with a stab wound. (Pl.'s Ex. 1, Tr. 11/29/76 at 325–342). The jury obviously did not agree with Denker's argument since it found the defendant guilty of murder in the first degree.

After being found guilty, petitioner brought numerous appeals and challenges, including the present petition for habeas corpus.[4] Petitioner's trial attorney, Barry Denker, was not involved in any of these appeals. Some years after representing petitioner, Denker was convicted of federal criminal offenses and placed in the witness protection program. Petitioner's counsel was unable to secure Denker's testimony for this habeas corpus proceeding. However, petitioner was able to locate some files kept by Denker regarding petitioner's case. The court does not attach any significance to these files since it cannot be sure that these files represent the entirety of Denker's work product in regard to petitioner's case.

Since being found guilty, petitioner has been diagnosed as suffering from PTSD. This diagnosis was initially made by Doctor Van Wye at Graterford prison in 1979 or 1980. (Tr. 5/26/93 at 64). Since 1980, petitioner has been considered thirty percent disabled by the Veteran's Administration due to his PTSD from his Vietnam service. (*Id.* at 65). In petitioner's present habeas corpus petition, he asserts that Denker was constitutionally ineffective because he failed to investigate and pursue a defense that the requisite intent for murder in the first degree was lacking because of his PTSD.

PTSD is the name given for a pattern of symptoms which affect people who have suffered a life-threatening traumatic event that is outside the normal range of human experience. (Tr. 6/7/93 at 82; Tr. 6/14/93 at 25; Tr. 6/16/93 at 21; Tr. 6/17/93 at 9–10). The symptoms of PTSD can vary from mild to severe and include intrusive recall through either daydreams, nightmares or physiological arousal (Tr. 6/14/93 at 26–27; Tr. 6/16/93 at 25; Tr. 6/17/93 at 10), avoidance reactions like emotional numbing (Tr. 6/14/93 at 27; Tr. 6/16/93 at 24–25; Tr. 6/17/93 at 10), hyperarousal, unusual startle responses, sleep disturbances (Tr. 6/14/93 at 30–31; Tr. 6/16/93 at 23), excessive sweating, rage reactions, violence, anxiety, depression and irritability (Tr. 6/7/93 at 82; Tr. 6/16/93 at 24; Tr. 6/17/93 at 10). Flashbacks, blackouts or dissociative states can impair a person's ability to deliberate or premeditate because a person in one of these states is acting with no conscious awareness of what he or she is doing. (Tr. 6/7/93 at 98–99; Tr. 6/14/93 at 27, 49–50; Tr. 6/16/93 at 27–28, 40–42, 62–64, 85; Tr. 6/17/93 at 14–20, 39–40).

Four medical witnesses testified at the evidentiary hearing before the magistrate judge on the present habeas corpus petition. Three experts were called by petitioner (Drs. Williams, Winter and Bjornson) and one was called by the respondents (Dr. Sadoff). Of these four experts, Drs. Bjornson and Sadoff were practicing mental health professionals in the Philadelphia area in 1976 who would have been available to assist and testify for the defense if Denker had chosen to pursue this strategy. All four experts agreed that sufficient information existed in psychiatric, mental health literature about what is now called PTSD[5] and that a mental health professional could have diagnosed and testified about PTSD at the time of trial. (Tr. 6/7/93 at 80–83; Tr. 6/14/93 at 37; Tr. 6/16/93 at 30–33; Tr. 6/17/93 at 38–39).

---

4. For a more comprehensive discussion of the procedural background regarding this matter, the court refers the reader to its March 16, 1993 memorandum and order. *Glass v. Vaughn*, 1993 W.L. 76231 (E.D.Pa. Mar. 16, 1993).

5. In 1976, respondents' expert stated that PTSD was called Vietnam stress. (Tr. 6/17/93 at 39).

All the experts agreed that petitioner suffered from PTSD at the time of the victim's death. (Tr. 6/7/93 at 93; Tr. 6/14/93 at 43; Tr. 6/16/93 at 39–40, 61–62; Tr. 6/17/93 at 22–23). The disagreement that exists between petitioner's experts and the respondents' expert is whether petitioner was suffering a flashback or a dissociative state at the time of the murder that impaired his ability to deliberate or premeditate. Petitioner's experts all believe that petitioner was in a form of a dissociative state or flashback when he killed the victim and thus could not have formed the specific intent necessary to commit murder in the first degree. Their conclusions were based on the nature of PTSD, petitioner's story of the events surrounding the victim's stabbing including his absence of memory [6], previous episodes of violence where petitioner had no recollection of his actions and the symbolic similarity between the victim's stabbing and petitioner's killing of women in Vietnam. While petitioner's experts all concede petitioner may be lying about the events surrounding the murder, none of them believed that this was very likely. (Tr. 6/7/93 at 114; Tr. 6/14/93 at 100; Tr. 6/16/93 at 73).

The respondents' expert, Dr. Sadoff, does not directly contradict the conclusion reached by petitioner's experts. In fact, he concedes that petitioner may have lacked the specific intent to commit murder in the first degree. (Tr. 6/17/93 at 39–40). Dr. Sadoff stated that he could not render a professional opinion on petitioner's ability to deliberate and premeditate at the time of the murder without further testing. (Tr. 23–24). This testing would include conducting a polygraph exam to measure petitioner's truthfulness about not remembering the murder and if he passed this test, conducting a sodium amytal interview to try to recapture the memory lost at the time of the murder. (*Id.*). This testing was never done since the parties could not agree upon the terms for performing this testing.

Phyllis Glass, petitioner's wife, testified at the evidentiary hearing before the magistrate judge. Ms. Glass testified about the bizarre behavior exhibited by petitioner prior to the murder. This behavior included spending a large amount of time in the basement of their house. Ms. Glass described the basement as a dark and dreary place with a painted window. Petitioner would go down to the basement with his dogs so that he could spend time with his snakes, pigs, white mice, a frog and various other animals. Ms. Glass testified that she would attempt to locate petitioner in the basement but was never successful because he would be hiding. (Tr. 5/26/93 at 192–193.)

Ms. Glass also testified about other bizarre behavior exhibited by petitioner. He claimed to have no memory of some of this. This behavior included petitioner's swinging a packing hook into a table and sticking her head in the oven. Petitioner's behavior also included nightmares which at times were "vicious"; his inability to sleep; running up and down the stairs and around the house until he became calm; jumping out of the bed after hearing a car backfire; and looking closely at her face to confirm it was Ms. Glass. Moreover, Ms. Glass testified that petitioner had crying spells and suffered strange reactions to rain. (Tr. 5/26/93 at 193–197.) Ms. Glass further testified that she had asked petitioner to seek psychiatric help prior to the murder. (*Id.* at 197–199). Finally, Ms. Glass testified that she was aware of the relationship between petitioner and the victim. (*Id.* at 200–03).

John Turner also testified at the evidentiary hearing before the magistrate judge. Turner stated that he would have testified at petitioner's murder trial in 1976 if he had been asked. (Tr. 5/26/93 at 152). Turner admitted he never contacted petitioner or his

---

**6.** Petitioner's version of the events of the killing that was given to the medical experts is consistent with that which he testified to at both the evidentiary hearing before the magistrate judge and this court. Petitioner now states that he has no recollection of stabbing the victim. Instead, all he remembers is that he went to Deborah Young's house looking for needles. He met the victim there and left with her to go to her house. Petitioner had an argument with the victim during which the victim swung at petitioner. The next thing petitioner recalls is picking up the victim who had been stabbed and putting her into the car to take her to the hospital. (Tr. 5/26/93 at 56–58, 111–112; Tr. 2/18/94 at 24–28).

attorney in 1976. (*Id.*). Turner knew petitioner from their Vietnam service together and as a civilian in Philadelphia before the murder. (*Id.* at 141–42, 150–51). Turner corroborated petitioner's version of his Vietnam experiences, including the killing of the Vietnamese woman. (*Id.* at 143–147).

The magistrate judge also heard the testimony of Janice Walker. Walker, a friend of petitioner, stated she would have testified on petitioner's behalf in 1976. (Tr. 5/26/93 at 178). Walker, like Turner, testified that she never attempted to contact petitioner's family or attorney. (*Id.* at 185). Walker stated that prior to the murder petitioner's behavior included nightmares, crying fits and excessive sweating. Walker also testified that she knew about the relationship between petitioner and the victim. (*Id.* at 174–177).

James Curry also testified at the evidentiary hearing. Curry, a friend of petitioner, stated that he did not know of the murder until after petitioner was convicted. (Tr. 5/26/93 at 169). Curry stated he would have testified for petitioner in 1976 if he had been asked. (*Id.* at 163–64). Curry testified that he was aware of petitioner's negative reaction to rain, his inability to remember violent events at bars and his reactions to startling noises. (*Id.* at 157–163).

Finally, the court heard the testimony of petitioner at the February 18, 1994 evidentiary hearing. Petitioner stated that he does not remember committing the crime. However, he testified that he would have admitted there was a "great possibility" that he had killed the victim if he knew what he does today about his illness. Petitioner also stated that Denker never inquired into his personal background and limited his questions to petitioner's actions on the night of the murder. Denker also failed to explain to petitioner the various degrees of murder and the penalties associated with each charge. If Denker had explained this and petitioner had known about his condition, he testified that he would have accepted responsibility for the murder and pled guilty to a charge of murder in the third degree. (Tr. 2/18/94 at 11–24). The court finds that petitioner was a credible witness.

## CONCLUSIONS OF LAW

Based on the above findings of fact, the court hereby makes the following conclusions of law:

### Ineffective Assistance of Counsel

In order to sustain a claim of ineffective assistance of counsel, petitioner must prove both prongs of the test pronounced by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). One prong of the *Strickland* test requires petitioner to demonstrate that his trial counsel's performance was deficient. This first prong involves showing that his trial counsel's errors or omissions were so serious that trial counsel did not function as "counsel" as guaranteed by the Sixth Amendment to the United States Constitution. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. The other prong of the *Strickland* test requires petitioner to demonstrate that his trial counsel's deficient performance prejudiced his defense at trial. This second prong involves a showing that petitioner's trial counsel's errors were so serious that they deprived petitioner of a fair trial and a just result. *Id.* If petitioner fails to satisfy either part of the *Strickland* test, there is no need to evaluate the other prong of the test. *Id.*

### (a) *Deficiency of Performance*

The respondents argue that the magistrate judge erred in concluding that petitioner's trial counsel's performance was deficient because of a failure to investigate. After examining the respondents' objections, the court agrees with the magistrate judge's conclusion.

■ In assessing this prong of the *Strickland* test, the court must determine whether "counsel's representation fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064. Judicial scrutiny of the reasonableness of counsel's performance must be "highly deferential" and the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the

circumstances, the challenged actions or omissions might be considered sound trial strategy." *Id.* at 689, 104 S.Ct. at 2065. The court must measure the reasonableness of counsel's performance after viewing all the circumstances in light of the prevailing professional norms. *Id.* at 688, 104 S.Ct. at 2064. This measurement must be evaluated on the facts of the case at the time of counsel's conduct. *Id.* at 690, 104 S.Ct. at 2065.

In a case like this one where there is a claim that counsel was ineffective for failing to adequately investigate possible defenses, the *Strickland* court stated that:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonably precise to the extent that reasonable professional judgment supports the limitations on the investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690–91, 104 S.Ct. at 2066. The reasonableness of trial counsel's actions may be affected by petitioner's statements, actions and choices. *United States v. Gray*, 878 F.2d 702 (3d Cir.1989), *citing, Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066. Counsel's failure to pursue certain investigations cannot later be challenged as unreasonable when the defendant has given counsel reason to believe that a line of investigation should not be pursued. *Id.* Counsel's conversations with petitioner may be critical in making a proper assessment of counsel's investigative decisions. *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066.

"Where the deficiencies in counsel's performance are severe and cannot be characterized as the product of strategic judgment, ineffectiveness may be clear. *Gray*, 878 F.2d at 711. Thus, when counsel fails to conduct any pretrial investigation, courts of appeals generally find that this failure constitutes a clear instance of ineffectiveness. *See Sullivan v. Fairman*, 819 F.2d 1382 (7th Cir.1987) (counsel's cursory attempts to locate witnesses ineffective); *Code v. Montgomery*, 799 F.2d 1481 (11th Cir.1986) (counsel interviewing only one witness was unreasonable); *Crisp v. Duckworth*, 743 F.2d 580 (7th Cir. 1984) (since attorney must investigate case in order to provide minimally competent representation, it will be unusual case where complete lack of investigation is not unreasonable); *Thomas v. Lockhart*, 738 F.2d 304 (8th Cir.1984) (investigation that solely involved reviewing the prosecutor's file falls short of what reasonable attorney would have done). As the Third Circuit stated in *Gray*,

> [I]neffectiveness is generally clear in the context of complete failure to investigate because counsel can hardly be said to have made a strategic choice against pursuing a line of investigation when s/he has not yet obtained the facts on which such a decision could be made.

*Gray*, 878 F.2d at 711.

Respondents assert that, contrary to the magistrate judge's report and recommendation, defense counsel's investigation was reasonable. Respondents raise numerous objections to the inferences that the magistrate judge drew from his factual findings. The court will examine each of the respondents' objections.

Respondents' first objection focuses on what the defendant told or failed to tell his trial counsel, Barry Denker. Respondents' objection points to the following findings of fact:

(1) petitioner told Denker a story consistent with that which he told the police concerning his activities the day of the murder;

(2) petitioner only told Denker he was in the service and not that he was in Vietnam or about his experiences in Vietnam; and

(3) petitioner never told Denker about his post-war episodes of violent or bizarre behavior that would have alerted trial counsel to any type of psychiatric defense. In support of this objection, the respondents cite to *Strickland*'s statement that the reasonable-

ness of counsel's investigation depends on petitioner's statements and actions. Since petitioner failed to reveal information which might have aided Denker and caused him to investigate a diminished capacity defense based on PTSD, respondents argue that Denker's investigation must be viewed as reasonable.

As the *Strickland* court noted, "inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigative decisions ..." 466 U.S. at 691, 104 S.Ct. at 2066. Section 4.1 of the American Bar Association Standards, The Defense Function which was in existence in 1976 states that "[I]t is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to guilt and *degree of guilt* or *penalty* ... The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or his stated desire to plead guilty."[7] (Pl.'s Ex. 9) (emphasis added). Thus, the fact petitioner told his trial counsel a story consistent with a previous police statement did not relieve Denker of a duty to investigate.

In addition, Section 3.2 of the American Bar Association Standards, The Defense Function states that "[A]s soon as practicable the lawyer should seek to determine all relevant facts known to the accused. In so doing, the lawyer should probe for all legally relevant information without seeking to influence the direction of the client's responses." (*Id.*). In the present case, trial counsel failed to comply with this standard. Petitioner was charged with murder in the first degree. This charge should have prompted Denker to seek information about petitioner's background in order to explore possible defenses to reduce the degree of murder. However, Denker never sought information from petitioner beyond the events of the day of the murder. Denker would have learned about petitioner's service in Vietnam if he had performed a more extensive interview. Denker also would have learned of petitioner's experiences in Vietnam as well as the bizarre

episodes that he had experienced since that time up until the time of the murder if he had interviewed petitioner on his background. This line of questioning should have been pursued since petitioner informed Denker during the course of the preliminary hearing that he was "in the service" and Denker had a duty to probe for all legally relevant information and to explore all avenues leading to facts relevant to guilt, degree of guilt and sentence.

Thus, if Denker had properly interviewed the defendant, the respondents' position that Denker's reliance on what petitioner told him may have made Denker's investigation reasonable. However, after examining Denker's conversations with petitioner as *Strickland* instructs, the court concludes that Denker's performance in this regard was deficient and cannot be viewed as the product of an informed strategic choice.

Respondents' second objection concerns Denker's failure to interview people suggested by petitioner who could have counteracted the testimony of some of the prosecution's witnesses and who could have testified about petitioner's relationship with the victim. Respondents assert that: (1) the witnesses suggested by petitioner did not testify at the evidentiary hearing before the magistrate judge and could not have supported a diminished capacity defense; and (2) Denker's refusal to pursue this evidence was reasonable since these issues do not bear on a diminished capacity defense.

One of the three witnesses suggested to Denker, Phyllis Glass, did testify at petitioner's evidentiary hearing. Her testimony will be discussed in the context of other objections discussed below. As to the other two witnesses, the court acknowledges that this finding by itself would not support a conclusion that trial counsel rendered ineffective assistance. Instead, the court included them in the factual findings to provide a complete background as to the limited extent of Denker's investigation.

The respondents' third objection focuses on Denker's failure to interview Phyllis

---

7. This American Bar Association standard was approvingly quoted by the Third Circuit in *United*

*States v. Baynes,* 687 F.2d 659, 667–68 (3d Cir. 1982).

Glass. Respondents argue that Denker's failure to interview Phyllis Glass was reasonable because: (1) she could not provide information about petitioner's activities at the crime scene; (2) she could not have supplied information that would have led to the defense now posited; and (3) she could not have confirmed that petitioner had no memory of the crime.

In this instance, the topic of conversation during the one and only time Denker spoke with Phyllis Glass concerned where Phyllis Glass could sell her valuables in order to pay his fee for representing petitioner at a bail hearing. It is uncontradicted by the evidence that Denker never spoke to Phyllis Glass about petitioner's crime or his background. The court concludes that a reasonable attorney, to comply with the ABA standards for the duty to investigate, would have spoken to the person petitioner was living with to find out about his background. If Denker had adequately interviewed petitioner and listened to the "losing his mind" evidence from the victim's diary, he would have explored petitioner's mental state with Phyllis Glass. Phyllis Glass testified at the evidentiary hearing before the magistrate judge about her eyewitness accounts of petitioner's bizarre and dangerous behavior before the crime of which he professed to having no memory. Ms. Glass also testified that she was available to testify about this information at trial. In *Code v. Montgomery,* 799 F.2d 1481 (11th Cir.1986), the court found that interviewing only one witness could be unreasonable. In this instance, Denker failed to even adequately interview petitioner as required in the American Bar Association Standards. Because of this failure, Denker failed to interview and investigate petitioner's background with the one person most likely to know vital information for a PTSD defense. If Denker had competently asked Ms. Glass questions concerning petitioner's mental state, the court finds that Ms. Glass would have volunteered this information.

Therefore, the court concludes that Denker's failure to interview Phyllis Glass was unreasonable since she would have provided information essential to a PTSD defense. All Denker needed to do in order to be directed to Phyllis Glass and obtain this information was to adequately interview petitioner in preparation for trial. Thus, Denker's decision not to interview Phyllis Glass was not the product of an informed strategic choice.

Respondents' fourth objection concerns Denker's failure to investigate petitioner's relationship with women. Respondents contend that the decision not to investigate this was reasonable, especially since the two female witnesses, Phyllis Glass and Janice Walker, testified that they found petitioner to be a caring and sensitive person. As the respondents acknowledge, the Commonwealth presented evidence at petitioner's 1976 trial of prior violent acts by petitioner toward women. (*See* Respondents' Post-Hearing Brief at 9 n. 4). While petitioner does not contend that Denker was ineffective for failing to investigate this aspect of the case, this testimony shows the importance of Denker's failure to adequately interview petitioner. Denker would have found it necessary to speak with others like Phyllis Glass and Janice Walker about petitioner's bizarre behavior if he had adequately interviewed petitioner. As these two testified before the magistrate judge, they would have testified if asked about their knowledge of petitioner's bizarre behavior. An adequate interview of these two people by counsel should have and would have alerted him to a possible PTSD defense.

Respondents' fifth objection concerns the victim's diary entry that petitioner "is losing his mind and it scares me to death." Respondents argue that Denker's failure to investigate petitioner's mental condition was reasonable even though this diary entry existed. The reason the respondents believe this decision was reasonable is that this entry was not sufficient to have alerted Denker to a psychiatric defense without any other information that others may have shared this same assessment of petitioner.

Respondents' position would have some merit if it stood in a vacuum. However, this is not the case. As stated above, Denker's interview with petitioner was deficient. This diary entry would have reinforced Denker's need to investigate a psychiatric defense if Denker had adequately interviewed petition-

er on his Vietnam experiences and his postwar episodes of bizarre behavior. This in turn would have led to interviewing other people like those presented at the hearing before the magistrate judge. This should have and would have compelled Denker to further investigate a PTSD defense. Thus, the diary entry is another piece of evidence supporting a finding that counsel's investigation was unreasonable and not the product of an informed strategic choice.

Respondents' sixth objection concerns Denker's failure to discuss potential defenses with petitioner before trial. Respondents assert that based on the evidence known to Denker at the time of trial, such a failure to discuss was reasonable since complete exoneration was the only feasible defense.

The court agrees with the respondents that the pursuit of this defense was reasonable based on the evidence that Denker knew as a result of his limited investigation. However, Denker's investigation into the crime and possible defenses was not reasonable. As stated above, assessing the reasonableness of an investigation decision necessitates an examination of counsel's conversations with petitioner. In this instance, the court has found that Denker's interview with petitioner was deficient. Moreover, the court has found that Denker would have been led to other information and witnesses that would have compelled an investigation into a possible psychiatric defense if he had adequately interviewed petitioner. Thus, counsel's failure to discuss possible defense choices demonstrates the resulting harm caused by the unreasonableness of Denker's investigation.

Respondents' seventh objection focuses on Denker's request for a continuance on the eve of the 1976 trial when he admitted he was not prepared. Respondents argue that this request has no bearing on the ineffectiveness claim of failing to investigate a PTSD defense. The court agrees. There is no evidence that if Denker had an additional week, month or year he would have conducted an adequate investigation. Respondents also argue that the request for a continuance is irrelevant because Denker competently represented petitioner at his 1976 trial.

"The exercise of the utmost skill during the trial is not enough if counsel has neglected the necessary investigation and preparation of the case or failed to interview essential witnesses or to arrange for their attendance." *Moore v. United States,* 432 F.2d 730, 739 (3d Cir.1970). Thus, the court concludes that Denker's competency at trial is irrelevant to the ineffectiveness issue currently before the court.

Respondents' eighth objection focuses on the finding of the magistrate judge that the defense presented by Denker was not credible. Respondents argue that Denker presented a strong defense at trial based upon the information he was made aware of by petitioner.

As stated above, a strong defense at trial does not absolve an attorney of the duty to investigate. As the Pennsylvania Supreme Court noted in its review of petitioner's trial:

> Appellant's [Glass] statement was more than adequate to isolate him as the killer of the deceased ... Appellant's weak denial became transparently false in the face of his own admissions and in light of the weight of other circumstantial evidence of his guilt"

*Commonwealth v. Glass,* 486 Pa. 334, 405 A.2d 1236, 1242 (1979). The court went on to describe petitioner's statement to the police as "an obvious falsehood." *Id.* 405 A.2d at 1243. Denker would have been alerted to the need to further investigate if he had conducted an adequate interview with petitioner. This investigation would have led to speaking with other people and ultimately a reasonable attorney would have also seen that petitioner's statement might well not be accepted by a jury. Thus, while Denker's defense may have been credible based on the limited information he sought, it was not credible in light of Denker's deficient investigation.

Respondents' ninth objection concerns the testimony of John Turner, Janice Walker and James Curry. The respondents assert that Denker's failure to seek these witnesses was reasonable since he had no basis to suspect they would have useful information. However, Denker would have discovered petition-

er's bizarre behavior if he had adequately interviewed petitioner and his wife. This discovery would have led a reasonable attorney to ask if there were other people to corroborate this type of behavior. If properly explained, the defendant would have volunteered the names of the people who appeared before the magistrate judge and · testified about petitioner's behavior.

Respondents also object to the magistrate judge's finding that Ronald Crawford was available in 1976 and would have provided useful testimony for a PTSD defense. (Magistrate Judge Finding of Fact No. 43). The court agrees with the respondents and gives no weight to the finding of the magistrate judge regarding Ronald Crawford since he is deceased and did not testify before the magistrate judge.

Respondents' tenth objection concerns the availability of medical research on PTSD. The respondents argue that Denker had no reason to seek this information based on the information he knew. Thus, respondents believe the court cannot find that this constitutes an inadequate investigation.

Once again, the court cannot agree with the respondents' argument because Denker did not adequately investigate this case. Respondents' own expert witness testified that adequate information existed in the medical community in 1976 about what is now known as PTSD. Denker would have been alerted to the need to research whether medical information existed to help his case if he had adequately interviewed petitioner and moved forward like a reasonable attorney. Thus, Denker's failure to pursue this medical information is another example of the deficiency in Denker's investigation.

After reviewing all the factual findings and considering the respondents' objections, the court concludes that the investigation of petitioner's trial counsel was clearly deficient under the first prong of *Strickland*. The court recognizes that the reasonableness of

counsel's actions may be influenced by petitioner's own statements and actions. *See Lewis v. Mazurkiewicz*, 915 F.2d 106, 111 (3d Cir.1990).[8] However, when reviewing counsel's investigative decisions, the court should examine the conversations which occurred between counsel and petitioner. *See Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066.

The facts are uncontradicted that Denker only focused his investigation on the events surrounding the crime. A reasonable attorney would have sought information on petitioner's background in order to explore possible defenses. His obligation was to investigate not only facts relevant to guilt, but also facts relevant to degree of guilt and penalty. Petitioner has stated that he would have told Denker about his experiences if Denker had asked and explained the need for such information. The court credits this testimony. Petitioner's information coupled with the victim's diary entry would have led a reasonable attorney to others who, if competently questioned by counsel, would have described petitioner's PTSD symptoms. After gathering this information, a reasonable attorney would have sought out expert witnesses and medical literature to determine the strengths and weaknesses of such a defense so that defense counsel could then present petitioner with a choice of which possible defense to pursue at trial. However, Denker never conducted this type of investigation. Instead, Denker pursued a limited investigation that the court finds to have fallen woefully short of one that a reasonable attorney would have undertaken. Therefore, the court concludes that Denker's investigation for petitioner's 1976 trial was unreasonable and deficient under the first prong of *Strickland*.

#### (b) *Prejudice*

■ Even though the court has concluded that petitioner's trial counsel's performance was professionally unreasonable, the court

---

8. In *Lewis*, counsel's decision not to interview a witness was reasonable since it was based upon the defendant's outline of the potential witness' testimony. This outline showed that a self-defense claim was not viable. Also, petitioner in *Lewis* did not claim that counsel could have located any other witnesses to support his self-

defense claim. The court essentially views Denker's investigation to have been a dereliction of his duty to investigate. Moreover, petitioner in this action has identified witnesses whom Denker could have interviewed that would have supported a PTSD defense.

cannot find that trial counsel was constitutionally ineffective unless the second prong of the *Strickland* test, prejudice to the defendant, is also met. In assessing prejudice, the court must determine "whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. A reasonable probability is one "sufficient to undermine confidence in the outcome." *Id.*

█ The court must evaluate this second prong in light of the totality of the evidence produced at trial since "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696, 104 S.Ct. at 2069. When demonstrating that he was prejudiced, petitioner cannot prevail simply by inviting the court to speculate as to what the witnesses, which counsel failed to interview, would have said. *United States v. Gray*, 878 F.2d 702, 712 (3d Cir.1989).

In *Gray*, the defendant sought to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255 on the ground of ineffective assistance of counsel. This claim was based on his trial counsel's alleged failure to conduct any pre-trial investigation, hire an investigator to conduct such an investigation, or to contact potential witnesses.

The *Gray* court, applying the *Strickland* standard, found that the defendant was entitled to relief under 28 U.S.C. § 2255 because he suffered ineffective assistance of counsel. When examining the issue of prejudice, the court focused on the evidence that the defendant produced at the evidentiary hearing which trial counsel would have discovered if he had conducted a reasonable investigation. After assessing the impact this evidence would have had in light of all the evidence produced at the defendant's trial, the *Gray* court concluded that the defendant was prejudiced because there was a reasonable probability that the outcome of the trial would have been different with this evidence.

█ Under Pennsylvania law, a defendant can establish the defense of diminished capacity if he can show that he did not have the capacity to possess the state of mind required to commit murder in the first degree.[9] *Commonwealth v. Garcia*, 505 Pa. 304, 479 A.2d 473 (1984); *Commonwealth v. Walzack*, 468 Pa. 210, 220–21, 360 A.2d 914, 919–20 (1976). In *Walzack*, the Supreme Court of Pennsylvania held that psychiatric evidence would be admissible for the purpose of showing that the defendant lacked the specific intent to kill. *Walzack*, 360 A.2d at 915. Because of the *Walzack* decision in July of 1976, the diminished capacity defense and the acceptability of psychiatric evidence to prove the defense were known to the trial bar in Pennsylvania at the time of petitioner's trial in November of 1976.

█ The court notes at the outset that petitioner's 1976 conviction was based on what even the respondents admit to have been circumstantial evidence. (Tr. 2/18/94 at 52). There were no eyewitnesses to the murder.

On the other hand, if Denker had adequately investigated petitioner's mental state in 1976, he would have found significant information and testimony that would have made the presentation of a diminished capacity defense viable. In order to present this defense, Denker first would have had to adequately interview petitioner and Phyllis Glass. Based on their testimony about his bizarre behavior and the case law of *Walzack*, Denker should have and would have been alerted to the potential defense of diminished capacity based on what is now known as PTSD.

This information would then have led Denker to additional lay witnesses to confirm the description of petitioner and Phyllis Glass of this bizarre behavior. At the evidentiary hearing before the magistrate judge, petitioner met his burden of demonstrating prejudice by presenting the testimony of John Turner, Janice Walker and James Curry. As the court described in its finding

9. In *Commonwealth v. Swartz*, 335 Pa.Super. 457, 484 A.2d 793 (1984), the Superior Court of Pennsylvania held that the diminished capacity defense is limited to a charge of first degree murder.

of facts, these three witnesses testified as to what they knew about petitioner's bizarre behavior prior to his 1976 murder trial. Their testimony would have corroborated the testimony of petitioner and Phyllis Glass.

After interviewing these lay witnesses, Denker should have and would have been alerted to the need to seek psychiatric testimony to support this defense. As the respondents' expert testified, sufficient psychiatric material was available in 1976 for a mental health professional to have made a diagnosis of what is now known as PTSD. Petitioner once again met his burden of demonstrating prejudice by presenting psychiatric testimony at the evidentiary hearing before the magistrate judge. Petitioner's three experts concluded that at the time of the crime petitioner lacked the mental state to commit murder in the first degree.

Of petitioner's experts, Dr. Bjornson was available to testify at petitioner's trial in 1976. It is Dr. Bjornson's medical opinion that petitioner was in a dissociative state when he stabbed the victim. Thus, Dr. Bjornson concluded that petitioner lacked ability to form the specific intent necessary to commit first degree murder. (Tr. 6/16/93 at 44–47). The testimony of Dr. Bjornson and petitioner's other two expert witnesses before the magistrate judge is virtually uncontradicted since respondents' expert, Dr. Sadoff, stated he needed further testing before he could render a professional opinion. This testing was never performed since the parties to this action could not reach an agreement on the terms for performing such testing.

Denker's failure to investigate all the information described above deprived petitioner of critical testimony. Upon completion of an investigation into a possible PTSD defense, Denker should have discussed the potential defenses available to petitioner and allowed him to choose which one to present to the jury. The evidence is uncontradicted that petitioner and Denker never discussed any possible defense choices before trial. The failure to investigate and discuss possible defenses deprived petitioner of a fair trial.

Petitioner would have had two choices if Denker had performed a reasonable investigation. First, he could have chosen to base his defense as he did at trial on the claim he did not commit the crime and either be acquitted or sentenced to life in prison. The second choice would have involved asserting a diminished capacity defense based on his PTSD. This defense could have resulted in a third degree murder conviction with a maximum ten (10) year term of imprisonment. Also, if Denker had reasonably investigated the information available to him on petitioner's PTSD, this may have led to a Commonwealth offer for a plea agreement involving murder in the third degree and a term of imprisonment of ten years or less.

The court finds that it is impossible to know at this time what petitioner would have chosen had Denker properly presented the two alternatives to him. However, petitioner has credibly testified that if he had been presented with the above information, he would have likely admitted his guilt and pursued a diminished capacity defense.[10] This would have resulted in petitioner pleading guilty to a charge of murder in the third degree because he would have accepted responsibility for his actions, even though to this day he cannot remember killing the victim. (Tr. 2/18/94 at 12, 23). Regardless of petitioner's choice, he was entitled to the choice and counsel was ineffective for not giving him that choice.

In summary, *Strickland* advised that when assessing prejudice, the court should consider the totality of the evidence produced at trial. *Strickland*, 466 U.S. at 696, 104 S.Ct. at 2069. In this instance, petitioner's 1976 conviction was based on circumstantial evidence. After considering the 1976 trial evidence and all the evidence which would have been presented at that trial if Denker had performed a reasonable investigation, the court concludes that there is a reasonable probability that the result would have been different and that the jury would have had a reasonable doubt about petitioner's guilt of murder in the first degree. Therefore, the court finds that petitioner suffered prejudice

10. Whether petitioner was a credible witness at the time of his trial is, of course, a very different question, particularly in view of his drug usage at the time.

because of Denker's deficient investigation. Accordingly, the second prong of the *Strickland* test is satisfied.

Respondents' sole objection to the magistrate judge's finding of prejudice concerns the testimony of the expert witnesses presented to the magistrate judge in connection with this habeas corpus petition. In particular, respondents' claim that the expert testimony offered by petitioner was inconsistent and relied on accepting petitioner's statements as being true. The court finds no merit in the respondents' argument. First, as the respondents point out, only Dr. Bjornson was available from among petitioner's experts to have testified at the 1976 trial. Thus, there would not have been an inconsistency. Second, even if all petitioner's experts were available, their conclusion was that petitioner suffered from PTSD at the time of the killing and was unable to form the requisite intent for murder in the first degree. Thus, the jury would have heard the same conclusion and would only have been called upon to perform a function a jury is normally called upon to do, resolve the inconsistency of the experts as to the cause of petitioner's infliction. Third and finally, petitioner's experts recognized that while petitioner could have been lying, they did not believe this to be the case. The story told to the experts was similar to that told to the court. As stated above, the court finds petitioner to be a credible witness and thus it concurs with the experts' belief that petitioner was not lying.

Since the court has concluded that petitioner has satisfied both prongs of *Strickland*, the court finds that petitioner's trial counsel rendered constitutionally ineffective assistance by his failure to properly investigate petitioner's case.

*Procedural Default—Miscarriage of Justice*

■ In the court's memorandum and order dated November 19, 1992, it found that petitioner exhausted his state remedies because it would now be futile to appeal to state court an adverse judgment from his second Post–Conviction Relief Act[11] hearing. *See Glass v. Vaughn,* No. 91–963, 1992 WL

(E.D.Pa. Nov. 19, 1992). However, this failure to appeal also constituted a procedural default. *Id.* Ordinarily, federal habeas corpus review is barred if petitioner has procedurally defaulted. *Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). The default will be excused if petitioner can demonstrate that a failure to consider his claims will result in a miscarriage of justice. *Coleman,* —— U.S. at ——, 111 S.Ct. at 2565.

■ The United States Supreme Court has repeatedly held that the scope of the miscarriage of justice exception is a narrow one. *See Sawyer v. Whitley,* —— U.S. ——, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992); *McCleskey v. Zant,* 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991); *Dugger v. Adams,* 489 U.S. 401, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989). This exception only applies when "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier,* 477 U.S. 478, 496, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986). The Supreme Court has suggested that the test for actual innocence is whether there is "a fair probability that, in light of all the evidence, including that alleged to have been … wrongly excluded or to have become available only after trial, the trier of fact would have entertained a reasonable doubt of his guilt." *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986). Thus, in order to prove that his trial counsel's ineffectiveness constituted a miscarriage of justice, petitioner must be able to show his "actual" innocence of first degree murder because of his diminished capacity.

In the present case, the evidence which was not developed because of Denker's ineffective assistance includes that of the lay and expert witnesses described above. Because Denker performed ineffectively, he never gave petitioner the chance to choose what defense he desired Denker to present at his 1976 trial. As the court has found, petitioner credibly states that he would have chosen a diminished capacity defense based on his

---

**11.** 42 Pa.C.S.A. § 9541 *et seq.*

PTSD if he had been fully informed. If the evidence had been presented at trial, there is certainly a fair probability that a trier of fact would have entertained a reasonable doubt as to his guilt of murder in the first degree. Thus, the court concludes that petitioner has suffered a fundamental miscarriage of justice in that a constitutional violation, ineffective assistance of counsel, has probably resulted in the conviction of petitioner of murder in the first degree when he is actually innocent of that crime and guilty of murder in the third degree. Therefore, the court finds that petitioner's petition for the issuance of a writ of habeas corpus should be granted.

An appropriate order follows.

### ORDER

AND NOW, this 13th day of July, 1994, IT IS HEREBY ORDERED that for the reasons stated in the attached memorandum that petitioner's petition for a writ of habeas corpus IS GRANTED. IT IS FURTHER ORDERED that the Commonwealth of Pennsylvania must provide petitioner with a new trial within 120 days of the date of this order or release petitioner.